S94A1854. STEPHENS˙v. THE STATE.
(456 SE2d 560)

FLETCHER, Justice.

Freddie Stephens challenges the constitutionality of OCGA § 16-13-30 (d), which provides for life imprisonment on the second conviction of the sale or possession with intent to distribute a controlled substance. He contends that the provision as applied is irrational and racially discriminatory in violation of the United States and Georgia Constitutions. The trial court denied his constitutional challenge and sentenced Stephens to two life sentences based on his conviction on two counts of violating the Georgia Controlled Substances Act by selling cocaine. We hold that OCGA § 16-13-30 (d) does not violate the due process or equal protection clauses of the Federal or State Constitutions based on the statistical evidence that Stephens presents and affirm.

1. The challenged statute states:

> (d) Except as otherwise provided, any person who violates subsection (b) of this Code section with respect to a controlled substance in Schedule I or a narcotic drug in Schedule II shall be guilty of a felony and, upon conviction thereof, shall be punished by imprisonment for not less than five years nor more than 30 years. Upon conviction of a second or subsequent offense, he shall be imprisoned for life.

OCGA § 16-13-30. Subsection (b) makes it unlawful to "manufacture, deliver, distribute, dispense, administer, sell, or possess with intent to distribute any controlled substance." For a defendant to receive a life sentence for a second conviction, the state must notify the defendant prior to trial that it intends to seek the enhanced punishment based on past convictions. See *Mays v. State,* 262 Ga. 90, 91-92 (414 SE2d 481) (1992); OCGA § 17-10-2.

Stephens contends that the statute as applied discriminates on the basis of race. He argues that this court should infer discriminatory intent from statewide and countywide statistical data on sentences for drug offenders. In Hall County, where Stephens was convicted, the trial court found that 100 percent (14 of 14) of the per-

sons serving a life sentence under OCGA § 16-13-30 (d) are African-American, although African-Americans make up less than 10 percent of the county population and approximately 50 to 60 percent of the persons arrested in drug investigations. Relying on evidence provided by the State Board of Pardons and Paroles, the trial court also found that 98.4 percent (369 of 375) of the persons serving life sentences for drug offenses as of May 1, 1994, were African-American, although African-Americans comprise only 27 percent of the state's population. Finally, a 1994 Georgia Department of Corrections study on the persons eligible for a life sentence under subsection (d) shows that less than one percent (1 of 168) of the whites sentenced for two or more convictions for drug sales are serving a life sentence, compared to 16.6 percent (202 of 1,219) of the blacks.

In an earlier challenge to death penalty sentencing in Georgia based on statistics showing that persons who murder whites are more likely to be sentenced to death than persons who murder blacks, the United States Supreme Court held that the defendant had the burden of proving the existence of purposeful discrimination and its discriminatory effect on him. *McCleskey v. Kemp*, 481 U. S. 279, 292 (107 SC 1756, 95 LE2d 262) (1987); see *State v. Agan*, 259 Ga. 541, 548 (384 SE2d 863) (1989), cert. denied, 494 U. S. 1057 (110 SC 1526, 108 LE2d 765) (1990); *State v. Causey*, 246 Ga. 735, 737 (273 SE2d 6) (1980). "Thus, to prevail under the Equal Protection Clause, [the defendant] must prove that the decision-makers in *his* case acted with discriminatory purpose." *McCleskey*, 481 U. S. at 292.

Relying on *McCleskey*, this court has held that the mandatory life sentence of OCGA § 16-13-30 (d) is constitutional as applied. See *Cain v. State*, 262 Ga. 598 (422 SE2d 535) (1992). In *Cain*, we rejected statistics, articles, and charts showing blacks are more likely to be imprisoned for drug offenses than are whites because the statistical evidence failed to prove an essential element to a selective prosecution case — "that the prosecution engaged in a deliberative selective process of enforcement based on race." Id. at 599. Similarly, we held in two other cases that there was insufficient evidence of selective enforcement against blacks to meet the standard of intentional discrimination. See *Hall v. State*, 262 Ga. 596, 597 (422 SE2d 533) (1992) (relying on standard announced in *Causey*), cert. denied, ___ U. S. ___ (113 SC 1956, 123 LE2d 660) (1993); *Hailey v. State*, 263 Ga. 210 (429 SE2d 917) (1993) (same standard applied to case from Hall County), cert. denied, ___ U. S. ___ (114 SC 700, 126 LE2d 667) (1994).

Stephens concedes that he cannot prove any discriminatory intent by the Georgia General Assembly in enacting the law or by the Hall County district attorney in choosing to seek life imprisonment in this case. His attorney stated at the sentencing hearing: "I cannot

prove and I do not feel there is any evidence to show that the district attorney's office is exercising their prosecutorial discretion in a discriminatory manner . . . [and] I don't think I can demonstrate the legislature acted with discriminatory intent in enacting this code section."[1] These concessions preclude this court from finding an equal protection violation under the United States Constitution. See *McCleskey*, 481 U. S. at 292; *Cain*, 262 Ga. at 599.

2. We also conclude that the statistical evidence Stephens presents is insufficient evidence to support his claim of an equal protection violation under the Georgia Constitution. Stephens fails to present the critical evidence by race concerning the number of persons eligible for life sentences under OCGA § 16-13-30 (d) in Hall County, but against whom the district attorney has failed to seek the aggravated sentence. Because the district attorney in each judicial circuit exercises discretion in determining when to seek a sentence of life imprisonment, a defendant must present some evidence addressing whether the prosecutor handling a particular case engaged in selective prosecution to prove a state equal protection violation. As the trial court found, Stephens failed to present any evidence of selective prosecution in pursuing an enhanced sentence.

Stephens' argument about inferring intent from the statistical evidence also ignores that other factors besides race may explain the sentencing disparity. Absent from the statistical analysis is a consideration of relevant factors such as the charges brought, concurrent offenses, prior offenses and sentences, representation by retained or appointed counsel, existence of a guilty plea, circuit where convicted, and the defendant's legal status on probation, in prison, or on parole. Without more adequate information about what is happening both statewide and in Hall County, we defer deciding whether statistical evidence alone can ever be sufficient to prove an allegation of discriminatory intent in sentencing under the Georgia Constitution.[2]

3. The dissent argues that *McCleskey v. Kemp* is not the controlling precedent, instead relying on the United States Supreme Court decision on peremptory challenges in jury selections in *Batson v. Kentucky*, 476 U. S. 79 (106 SC 1712, 90 LE2d 69) (1986). We must look to *McCleskey* for a proper analysis of the substantive issue before us, rather than *Batson*, because *McCleskey* dealt with the use

---

[1] At a subsequent hearing, Stephens again admitted that he could not prove that the district attorney's office is enforcing the statute in a discriminatory fashion. I know the Courts have no discretion so the Courts certainly aren't applying the statute in a discriminatory fashion and I do not believe I can demonstrate that the legislature in enacting the statute enacted it with discriminatory intent.

[2] See *Grissom v. Gleason*, 262 Ga. 374, 376, n. 1 (418 SE2d 27) (1992); see also *State v. Russell*, 477 NW2d 886 (Minn. 1991) (relying on state constitution to invalidate criminal statute that imposed a disproportionate burden on black persons).

of statistical evidence to challenge racial disparity in sentencing, as does this case.

The Supreme Court in *McCleskey* pointed out several problems in requiring a prosecutor to explain the reasons for the statistical disparity in capital sentencing decisions. Many of these same problems exist in requiring district attorneys to justify their decisions in seeking a life sentence for drug offenses based on statewide, and even countywide, statistics of persons serving life sentences in state prisons for drug offenses.

First, "[r]equiring a prosecutor to rebut a study that analyzes the past conduct of scores of prosecutors is quite different from requiring a prosecutor to rebut a contemporaneous challenge to his own acts. See *Batson v. Kentucky*, 476 U. S.[, supra]" *McCleskey*, 481 U. S. at 296, n. 17. Second, statewide statistics are not reliable in determining the policy of a particular district attorney.

> It is also questionable whether any consistent policy can be derived from studying the decisions of prosecutors. The District Attorney is elected by the voters in a particular county. See Ga. Const., Art. 6, § 8, Par. 1. Since decisions whether to prosecute and what to charge necessarily are individualized and involve infinite factual variations, coordination among district attorney offices across a State would be relatively meaningless. Thus, any inference from statewide statistics to a prosecutorial "policy" is of doubtful relevance.

Id. at 295-296, n. 15.[3] Finally, the Court stated that the policy considerations behind a prosecutor's discretion argue against requiring district attorneys to defend their decisions to seek the death penalty. Id. at 296; see also *Mobley v. State*, 265 Ga. 292 (455 SE2d 61) (1995) (noting problems related to prosecutors' testifying regarding their reasons for rejecting defendants' offers to plead guilty in a death penalty case). Since district attorneys are elected to represent the state in all criminal cases, it is important that they be able to exercise their discretion in determining who to prosecute, what charges to bring, which sentence to seek, and when to appeal without having to account for each decision in every case.

4. Stephens also argues that the statute violates due process and equal protection by creating an irrational sentencing scheme. Seeking to deter repeated drug sales by the same person is not irrational.

---

[3] Even the statistics from Hall County do not accurately reflect the record of the district attorney in this case since she did not assume office until 1993.

Therefore, we adhere to our previous decision that there is a rational basis for the sentencing scheme in OCGA § 16-13-30 (d) and that it does not deprive persons of due process or equal protection under the law. See *Tillman v. State*, 260 Ga. 801 (400 SE2d 632) (1991); accord *Isom v. State*, 261 Ga. 596 (408 SE2d 701) (1991).

*Judgment affirmed. All the Justices concur, except Thompson, J., who concurs specially and Benham, P. J., Sears and Hunstein, JJ., who dissent.*

CARLEY, Justice, concurring.

I concur fully in the majority's affirmance of appellant's life sentence. However, I write separately so as to explicate why, in my opinion, the Georgia Constitution provides this court with no independent authority to order a remand for a hearing wherein the prosecutor must defend the decision to seek the imposition of that sentence against appellant.

It is appellant's contention that OCGA § 16-13-30 (d) is violative of the equal protection clause of the Georgia Constitution, Art. I, Sec. I, Par. II, because it discriminates against him as an African-American criminal defendant. It is certainly clear that this court may interpret the equal protection clause of our state constitution as affording greater *rights* to our citizens than does the federal equal protection clause as interpreted by the Supreme Court of the United States. *Grissom v. Gleason*, 262 Ga. 374, 376 (2), fn. 1 (418 SE2d 27) (1992). However, there is no dispute that the *right* of this state's citizens to be free from the racially discriminatory application of statutes is clearly guaranteed by our state constitution as well as by the Constitution of the United States. Therefore, in this case, we must decide whether appellant has shown that this separate state constitutional right has been violated by the imposition of a sentence under OCGA § 16-13-30 (d). When assessing equal protection challenges, this court has consistently applied the *analysis* established by the Supreme Court of the United States in making this determination. *Grissom v. Gleason*, supra at 375 (2). See also *Barge-Wagener Constr. Co. v. Morales*, 263 Ga. 190, 193 (2) (429 SE2d 671) (1993); *Ambles v. State*, 259 Ga. 406, 407 (2) (383 SE2d 555) (1989). Under that analysis, our focus must be upon whether appellant has shown that "the decisionmaker *in his case* acted with discriminatory purpose. *McCleskey v. Kemp*, 481 U. S. 279, 292 (107 SC 1756, 95 LE2d 262) (1987)." (Emphasis in original.) *Cain v. State*, 262 Ga. 598, 599 (2) (422 SE2d 535) (1992).

The defendant in *Batson v. Kentucky*, 476 U. S. 79 (106 SC 1712, 90 LE2d 69) (1986) made a prima facie showing that racial discrimination may have been a factor in the jury selection in *his case* and, under those circumstances, the Supreme Court of the United States

held that it was incumbent upon the prosecutor to rebut that showing. In *McCleskey*, however, the Supreme Court of the United States specifically rejected the proposition that a prima facie case of racial discrimination in the implementation of a sentencing statute could be shown by mere reliance upon statistics compiled from other cases and held that, under those circumstances, the prosecutor had *no* burden to justify his sentencing decision. The refusal of the Supreme Court of the United States

> to require that the prosecutor provide an explanation for his decisions in [*McCleskey*] is completely consistent with [that] Court's longstanding precedents that hold that a prosecutor need not explain his decisions unless the criminal defendant presents a prima facie case of unconstitutional conduct with respect to *his case.* See, e.g., *Batson v. Kentucky*, supra
> . . . .

(Emphasis supplied.) *McCleskey v. Kemp*, supra at 296, fn. 18.

Accordingly, while appellant has an unchallenged *right* to be sentenced for his crime without regard to his race, the holding in *Grissom* compels us to apply the *analysis* of *McCleskey* in determining the viability of his claim that the sentence imposed upon him pursuant to OCGA § 16-13-30 (d) violates the equal protection clause of our state constitution. We cannot simply ignore the mandate of *Grissom* and conclude that this court is authorized to extend the remedial mandate of *Batson* to a defendant who has presented absolutely no evidence of any purposeful racial discrimination in his case. By so doing, we would sub silentio revive "a new equal protection analysis" of Art. I, Sec. I, Par. II of the Georgia Constitution which was specifically rejected in *Grissom*, supra at 376 (2). I adhere to *Grissom* and concur in the affirmance of appellant's sentence because he has not shown that purposeful racial discrimination was a factor therein.

THOMPSON, Justice, concurring specially.

1. On previous occasions this Court rejected claims that OCGA § 16-13-30 (d) is being enforced discriminatorily against African-Americans. See *Hailey v. State*, 263 Ga. 210, 211 (429 SE2d 917) (1993); *Hall v. State*, 262 Ga. 596, 597 (422 SE2d 533) (1992). In so doing, we noted that the statistical evidence of selective enforcement was insufficient to meet the intentional discrimination test.

OCGA § 16-13-30 (d) provides the *same* enhanced punishment, a life sentence, *for all* who are convicted of a second or subsequent sale of certain controlled substances. Despite the fact that the statute provides for only one sentence, a mandatory life sentence, we are

presented once again with the claim that OCGA § 16-13-30 (d) is being used in a discriminatory fashion. This time, we are introduced to statewide statistical information which must give us pause: From 1990 to 1994, OCGA § 16-13-30 (d) was used to put 202 out of 1,107 eligible African-Americans in prison for life. During that same period, the statute was used to put 1 out of 167 eligible whites in prison for life. A life eligible African-American had a one in six chance of receiving a life sentence. A life eligible white had a 1 in 167 chance of receiving a life sentence. An African-American was 2,700 percent more likely to receive a life sentence than a white. Stated another way, a white was 2,700 percent more likely *not* to receive a life sentence under the same statute, a statute which provided for only one sentence — a life sentence. These statistics are no doubt as much a surprise to those who work and practice within the judicial system as to those who do not.

Statistical information can inform, not explain. It can tell what has happened, not why. However, only a true cynic can look at these statistics and not be impressed that something is amiss. That something lies in the fact that OCGA § 16-13-30 (d) has been converted from a mandatory life sentence statute into a statute which imposes a life sentence only in those cases in which a district attorney, in the exercise of his or her discretion, informs a defendant that the State is seeking enhanced punishment. See *Mays v. State*, 262 Ga. 90, 91-92 (414 SE2d 481) (1992); *State v. Hendrixson*, 251 Ga. 853, 854-855 (310 SE2d 526) (1984); OCGA § 17-10-2.

*McCleskey v. Kemp*, 481 U. S. 279 (107 SC 1756, 95 LE2d 262) (1987) provides a workable test for determining whether the death penalty statute is being applied discriminatorily. *McCleskey* should continue to be applied in death penalty cases where there is a system of checks and balances to ensure that death sentences are not sought and imposed autocratically. Likewise *McCleskey* should be applied in other cases where the courts have discretion to determine the length of time to be served. However, *McCleskey* probably should not be applied where a district attorney has the power to decide whether a defendant is sentenced to life, or a term of years. That is the case here: Once a defendant is informed that the State is seeking a life sentence under OCGA § 16-13-30 (d), and he is convicted of a second offense under that statute, the sentencing court has no alternative but to impose a life sentence. OCGA § 16-13-30 (d).

I am persuaded that *Batson v. Kentucky*, 476 U. S. 79 (106 SC 1712, 90 LE2d 69) (1986), could be used to supply a general framework in analyzing cases of this kind. This, however, will need more careful study. Nevertheless, it is my considered view that the judgment in this case must be affirmed because the defendant has failed to meet his burden even under a *Batson*-type analysis.

In order to establish a prima facie case under *Batson*, a defendant must prove systematic discrimination in his particular jurisdiction. *Batson*, supra at 94. Although the statistics presented by defendant are indicative of a statewide pattern of discrimination in the use of OCGA § 16-13-30 (d), the Hall County statistics are insufficient to make such a case. They simply show that all the persons in Hall County serving a life sentence under OCGA § 16-13-30 (d) are African-Americans. They do not show how many African-Americans were eligible to receive a life sentence under the statute; nor do they show how many whites were eligible. Moreover, they offer no information concerning the record of the district attorney in this case. Thus, upon careful review, I must conclude that this defendant, in this case and on this record, failed to prove a pattern of systematic discrimination in his jurisdiction.

2. The legislature enacted OCGA § 16-13-30 (d) with the expectation that unrepentant drug sellers would be imprisoned for life. But that is not happening. Statewide, approximately 15 percent of eligible offenders receive a life sentence under OCGA § 16-13-30 (d).

The statistical evidence presented in this case serves as notice to the General Assembly of Georgia that the mandatory life sentence provision of OCGA § 16-13-30 (d) has been repealed de facto. With such notice, there are at least three courses of action the legislature might now choose to pursue.

(1) The General Assembly could choose to leave the mandatory life sentence on the books realizing that it is being used in a small percentage of the eligible cases. Militating against this course of action is the fact that all laws passed by the legislature should be followed. Contempt for and failure to follow any law breeds contempt for and failure to follow other laws.

(2) The General Assembly could reaffirm its commitment to a mandatory life sentence by requiring district attorneys to inform all defendants of prior convictions and thus enforce OCGA § 16-13-30 (d) with respect to all life eligible offenders. Militating against this course of action is the fact that mandatory life sentences are not favored by the prosecuting bar or by the defense bar. That is evidenced by the fact that from 1990 to 1994 only 203 out of 1,274 life eligible defendants actually received a life sentence under OCGA § 16-13-30 (d). Thus, nearly 85 percent of those convicted of a second or subsequent sale received a sentence of something less than life. Clearly, mandatory life sentences for this offense are not favored.

(3) The General Assembly could choose to change the mandatory life sentence penalty to one of several sentencing options which the court could impose. For example, the penalty for a second or subsequent sale could be imprisonment for not less than five nor more than thirty years, or life. See, e.g., OCGA §§ 16-6-1 (b); 16-8-41 (b). The

judge would then have the option to enter a sentence up to and including a life sentence. Any use or abuse of a life sentence would then be subject to review and correction, if necessary. See OCGA § 17-10-6.

Of course, the General Assembly could find other ways to address the problems posed by OCGA § 16-13-30 (d). It is my concern that these problems be resolved in whatever way the General Assembly deems best and that, thereafter, the prosecutors and the courts carry out that legislative will.

BENHAM, Presiding Justice, dissenting.

Of those persons from Hall County serving life sentences pursuant to OCGA § 16-13-30 (d), which mandates a life sentence for the second conviction for sale of or possession with intent to distribute certain narcotics, one hundred percent are African-American, although African-Americans comprise only approximately ten percent of Hall County's population. In our state prison system, African-Americans represent 98.4% of the 375 persons serving life sentences for violating OCGA § 16-13-30 (d). These statistics were part of the finding of the trial court in this case. In the face of such numbing and paralyzing statistics, the majority says there is no need for inquiry. It is with this determination that I take issue and from which I respectfully dissent.

Appellant makes two claims with regard to OCGA § 16-13-30 (d): (1) The statute is unconstitutional on its face and (2) the statute is unconstitutional as applied. As to the claim that OCGA § 16-13-30 (d) violates the Fifth, Sixth and Eighth Amendments of the United States Constitution, I agree with the majority opinion that it does not. But as to the claim that OCGA § 16-13-30 (d), as applied, violates the Fourteenth Amendment of the United States Constitution and Art. I, Sec. I, Par. II of the Georgia Constitution, I agree with appellant that it does.

1. I do not write on a clean slate on the issue of whether a violation of the Fourteenth Amendment to the United States Constitution has occurred. A long line of cases has dealt with this very issue. My analysis begins with *Strauder v. West Virginia*, 100 U. S. 303 (25 LE 664) (1880), where the U. S. Supreme Court struck down a state statute under which only white men were qualified for jury duty. In the dissent in *Swain v. Alabama*, 380 U. S. 202, 230 (85 SC 824, 13 LE2d 759) (1965), Justice Goldberg quoted from *Strauder*:

> It is well known that prejudices often exist against particular classes in the community, which sway the judgment of jurors, and . . . deny to persons of those classes the full enjoyment of that protection which others enjoy.

In that dissent, Justice Goldberg sought to apply the principles of equal protection stated in *Strauder* in a manner which foreshadowed the later developments in *Batson v. Kentucky*, 476 U. S. 79 (106 SC 1712, 90 LE2d 69) (1986).

To assert a successful Equal Protection claim, there has always been a requirement at the federal level that purposeful or intentional discrimination be shown. *Whitus v. Georgia*, 385 U. S. 545 (87 SC 643, 17 LE2d 599) (1967). Faced in *Swain v. Alabama*, supra, with a claim of denial of Equal Protection in the use of peremptory challenges, the United States Supreme Court recognized the horrors of discrimination, but nevertheless imposed a heavy burden on those who would claim discrimination, requiring that they "show the prosecutor's systematic use of peremptory challenges against Negroes over a period of time" (id. at 227) in order to prevail on an Equal Protection claim.

This almost impossible burden of proof imposed by *Swain* frustrated those who sought to claim a Fourteenth Amendment violation in the area of peremptory challenges. Hence, the court revisited the issue some 21 years later in *Batson v. Kentucky*, supra. The weighty burden of *Swain* was rejected as being inconsistent with Equal Protection standards developed subsequently. In its place, the Supreme Court installed a system that shifted the burden to the prosecutor to give race-neutral reasons for the peremptory challenges once the defendant established facts supporting an inference that the prosecutor's use of peremptory challenges was racially motivated. Relying in part on language in *Swain* and on housing and employment discrimination cases,[4] the court in *Batson* stated that an inference of discriminatory intent could be drawn from certain conduct or statistical data. Beyond its effect on peremptory challenges, the importance of *Batson* was that it significantly reduced the burden on one claiming discrimination, recognizing that under certain circumstances, the crucial information about an allegedly discriminatory decision could only come from the one who made the decision.

This is the course of reasoning we need to follow in analyzing the issue in this case rather than the more restrictive course taken in *McCleskey v. Kemp*, 481 U. S. 279 (107 SC 1756, 95 LE2d 262) (1987), and applied by the majority. As appellant cogently argued, *McCleskey* dealt with the death penalty procedure, with its many variables, including extremely broad discretion placed in the jury, whereas the

---

[4] E.g., *Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U. S. 252 (97 SC 555, 50 LE2d 450) (1977); *Washington v. Davis*, 426 U. S. 229 (96 SC 2040, 48 LE2d 597) (1976). The federal courts also had prompting in such state court decisions as *People v. Wheeler*, 22 Cal.3d 258 (148 Cal. Rptr. 890, 583 P2d 748) (1978); and *Commonwealth v. Soares*, 377 Mass. 461 (387 NE2d 499), cert. denied, 444 U. S. 881 (100 SC 170, 62 LE2d 110) (1979).

legislation involved in this case deals with what purports to be a straightforward sentencing process: if the conviction fits within the statute, a life sentence is mandatory. But it is in the application of the sentencing scheme that discretion comes into play and, with it, the specter of invidious discrimination. For a defendant to receive a life sentence for a second conviction, the State must notify the defendant prior to trial that it intends to seek the enhanced punishment based on past convictions. See *Mays v. State*, 262 Ga. 90, 91-92 (414 SE2d 481) (1992); OCGA § 17-10-2. That district attorneys employ very broad discretion to decide in which cases the State will choose to apply OCGA § 16-13-30 (d) is demonstrated beyond question by the data from the study conducted for the Supreme Court Commission on Racial and Ethnic Bias in the Courts: of the 1,184 cases identified as showing eligibility for a life sentence, it was only imposed in less than 15 percent of the cases, which is to say that it was not imposed in more than 85 percent of the cases.

I am not unmindful or unappreciative of the vital and taxing role district attorneys are called upon to undertake in the ongoing battle against the blight of illicit drug trafficking. Throughout this state, they shoulder an enormous burden of responsibility for advancing the fight against drugs, and to do so successfully, they must be invested with considerable discretion in making decisions about ongoing prosecutions. However, it is the very breadth of that discretion, concentrated in a single decision-maker, which makes it necessary that the one exercising the discretion be the one, when confronted with facts supporting an inference of discriminatory application, to bear the burden of establishing that the discretion was exercised without racial influence. This case is more like *Batson* than *McCleskey* because all the discretion in the sentencing scheme involved in this case resides in the district attorney, to the exclusion of the trial court, whereas in death penalty cases such as *McCleskey*, the spread of discretion among the prosecutor, the trial court, and the jurors introduces variables which call for more rigorous statistical analysis. In addition, the complexity of the death penalty procedure, with its many safeguards and the recurring necessity of specific findings at every stage from the grand jury to the sentencing jury, differentiates it from the relative simplicity of the sentencing scheme applicable to this case. The expressed concern of the State and of the majority that the procedure I propose in this case is applicable to death penalty cases is wholly unfounded. The only similarity between this case and *McCleskey* is that they both involve sentencing. It is the very different processes by which the sentences are determined which distinguish these very different cases. My analysis and the remedy proposed herein apply only to OCGA § 16-13-30 (d).

The sentencing scheme involved in this case is not so complicated

as that involved in death penalty cases. The prosecutor alone exercises discretion with regard to the sentence. If the district attorney chooses to give notice that a prior conviction will be used in aggravation of sentencing, a conviction can have only one outcome, based on discretion that is beyond review. It was just such an insulation from review which prompted the *Batson* court to reject the "crippling burden of proof . . . [that rendered] prosecutor's peremptory challenges . . . largely immune from constitutional scrutiny."

Appellant also notes correctly that the U. S. Supreme Court recognized in *McCleskey* itself that statistical proof which presents a " 'stark' pattern" may be accepted as the sole proof of discriminatory intent. 481 U. S. at 293. In distinguishing *McCleskey* from such a case, the Supreme Court mentioned in fn. 12 cases in which "a statistical pattern of discriminatory impact demonstrated a constitutional violation." Id., fn. 12. One was *Gomillion v. Lightfoot*, 364 U. S. 339 (81 SC 125, 5 LE2d 110) (1960), where a city's boundaries were altered so as to exclude 395 of 400 black voters without excluding a single white voter, and the other was *Yick Wo v. Hopkins*, 118 U. S. 356 (6 SC 1064, 30 LE 220) (1886), in which an ordinance requiring permits for the operation of laundries was applied so as to exclude all of the over 200 Chinese applicants and only one white applicant. The statistics in those cases presented a " 'stark' pattern" (*McCleskey*, supra at 481 U. S. 293), but no more stark than the pattern presented in this case. In the present case, based on evidence from law enforcement officers who testified as to arrest rates and other relevant statistics,[5] the trial court found that 100 percent of the people from that county who were serving life sentences pursuant to OCGA § 16-13-30 (d) were African-Americans and that statewide, 98.4 percent of all the persons serving life sentences pursuant to OCGA § 16-13-30 (d) were African-Americans.[6] From a study commissioned by the Supreme Court Commission on Racial and Ethnic Bias in the Court System, conducted by the Chief of Research of the Georgia Department of Corrections, and certified to this court by the trial court as a supplemental record, it appears that of 167 white prisoners identified as be-

---

[5] Agent David McIlwraith testified that 50 percent of the drug investigations involved black males. Investigator Shelly Manny testified that of the sixty drug investigations she conducted in Hall County, only nine involved blacks and that only fifty percent of her undercover buys involved black males. Another narcotics investigator testified that since 1989, he had made over 300 cocaine distribution cases in Hall County and only 60 percent involved black males.

[6] "One hundred percent (100%) of the people serving life sentences in the state prison system under OCGA § 16-13-30 (d) from Hall County are African-Americans, although the African-American population in Hall County is approximately 10%. At this time 369 of 375 persons serving life sentences in Georgia under OCGA § 16-13-30 (d) are African-Americans, although African-Americans comprise only 37% (sic 27%) of the total state population." R. 122-123.

ing eligible for a life sentence pursuant to OCGA § 16-13-30 (d) by virtue of a second conviction for a drug sales offense,[7] only one received that sentence. By contrast, of a total of 1,017 African-American prisoners identified as being eligible under the same criteria, 202 received a life sentence. Expressed as percentages, those findings indicate that an African-American convicted of two or more drug sales offenses is 2,761 percent more likely to receive a life sentence than a white person convicted of two or more drug sales offenses.[8] The majority finds the statistical evidence presented by appellant to be insufficient and goes on to express some doubt that statistical evidence alone can ever be sufficient to prove an allegation of discriminatory intent. In *Hall v. State*, 262 Ga. 596 (422 SE2d 533) (1992), and in *Hailey v. State*, 263 Ga. 210 (429 SE2d 917) (1993), I concurred in decisions rejecting claims of racially discriminatory application of the statutes involved here, pointing out in each concurrence that

> while there is *some* evidence to support appellant's allegation of selective prosecution, that evidence is insufficient under both the intentional discrimination standard adopted by this court in *State v. Causey*, 246 Ga. 735 (2) (273 SE2d 6) (1980), and the disparate treatment standard utilized in *State v. Russell*, 477 NW2d 886 (Minn. 1991).

*Hailey*, supra at 214. Now, faced with the majority's insistence that even the stark pattern demonstrated in this case will not meet those standards, I believe it is necessary that we adopt a procedure which will make it possible to address the issue openly and honestly in the trial courts.

The majority's reliance on *McCleskey* without recognizing the differences between the contexts of that case and this one causes this court to fall short of its responsibility to further the development of the law. This case offers us an opportunity to contribute in a positive way to the advancement of federal constitutional law. This could be a watershed case, and this court should seize this opportunity to establish a procedure similar to that outlined in *Batson* to make it possible for a defendant effectively to challenge the use of life sentences in a

---

[7] The study did not include those convicted of possession with intent to distribute, although that offense also triggers the provisions of OCGA § 16-13-30 (d), because the database maintained by the Department of Corrections does not distinguish between simple possession, which does not trigger a mandatory life sentence, and possession with intent to distribute.

[8] This percentage is derived from a calculation explained in testimony by the author of the study and using figures developed in the study showing a 0.6 percent likelihood of life sentence for a white defendant eligible for sentencing under the statute, and a 16.57 percent likelihood for an eligible African-American defendant.

racially discriminatory fashion.

In seeking to show discriminatory application of this sentencing scheme, the burden should remain on the defendant alleging discrimination to prove the existence of purposeful discrimination. See *Batson*, supra at 93. However, as the U. S. Supreme Court went on to say in *Batson* at 93-94,

> In deciding if the defendant has carried his burden of persuasion, a court must undertake "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." [Cit.] Circumstantial evidence of invidious intent may include proof of disproportionate impact. [Cit.] . . . [A] defendant . . . may make out a prima facie case of purposeful discrimination by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose. [Cit.] Once the defendant makes the requisite showing, the burden shifts to the State to explain adequately the racial exclusion [in the present case, exclusivity]. [Cit.] The State cannot meet this burden on mere general assertions that its officials did not discriminate or that they properly performed their official duties. [Cits.] Rather, the State must demonstrate that "permissible racially neutral selection criteria and procedures have produced the monochromatic result." [Cits.]

The Supreme Court continued in *Batson* by providing an explanation of what a defendant must show to establish a prima facie case. That explanation is eminently adaptable to the procedure I propose we adopt in this case:

> The defendant initially must show that he is a member of a racial group capable of being singled out for differential treatment. [Cit.] In combination with that evidence, a defendant may then make a prima facie case by proving that in the particular jurisdiction [the sentencing provision has been used exclusively or in a manner disproportionate to population percentages against the defendant's group]. Proof of [exclusive or disproportionate use] raises an inference of purposeful discrimination because the "result bespeaks discrimination." [Cit.]

*Batson*, supra at 94. The proof appellant offered in this case clearly shows a " 'stark' pattern," an application of the statute which "bespeaks discrimination." That being so, I would hold that he was entitled by the Fourteenth Amendment to the U. S. Constitution to have the prosecution make race-neutral explanation for its application of

the aggravated sentencing procedure.

2. Even if I were not convinced that the Fourteenth Amendment to the U. S. Constitution requires the establishment of the procedure I propose herein, I would propose it as an appropriate procedure to safeguard the citizens of this state against deprivation of the right to equal protection of the law as it is guaranteed in the Georgia Constitution.[9]

In *Grissom v. Gleason*, 262 Ga. 374 (2) (418 SE2d 27) (1992), we noted that while the equal protection clause of the Georgia Constitution has been treated as being coextensive with the equal protection clause of the U. S. Constitution, "this court may interpret the equal protection clause in the Georgia Constitution to offer greater rights than the federal equal protection clause as interpreted by the United States Supreme Court."[10] Id. fn. 1. We need not always follow the federal courts. In some instances we must lead the way as state courts did in *Wheeler*, supra, and in *Soares*, supra. In my dissent in *Livingston v. State*, 264 Ga. 402 (444 SE2d 748) (1994), I said that our constitution is not without protection for our citizens:

> In deciding under our constitution whether all . . . should stand equal before the law, we must draw from the wellspring of Georgia history, keeping in mind that Georgia is one of the thirteen original colonies which, unlike the subsequently-formed states which drew strength from the central government, furnished strength to the central government from our storehouse of rights. But in doing so, we did not leave our state constitutional cupboard completely bare and entirely bereft of protection for our own citizens.

Id. at 415. In keeping with that position, I assert here that this is the time for this Court to draw from our historical strength and our determination that the citizens of this state be treated fairly before the law, and declare that Georgia's constitutional guarantee of equal protection requires that OCGA § 16-13-30 (d) be applied evenly, in a race-neutral fashion. Although I would draw entirely from our own constitution the authority to put protective measures in place, I pro-

---

[9] Article I, Section I, Paragraph II of the 1983 Georgia Constitution provides as follows: "Protection to person and property is the paramount duty of government and shall be impartial and complete. No person shall be denied the equal protection of the laws."

[10] See, e.g., *State v. Miller*, 260 Ga. 669, 671 (398 SE2d 547) (1990) (finding 1983 Georgia Constitution provides broader protection than the First Amendment); *Green v. State*, 260 Ga. 625, 627 (398 SE2d 360) (1990) (finding State Constitution grants a broader right against self-incrimination than the U. S. Constitution); *Fleming v. Zant*, 259 Ga. 687, 690 (386 SE2d 339) (1989) (holding state constitutional guarantee against cruel and unusual punishment is more extensive than federal constitutional standard).

pose, as I did when considering this case from a federal constitutional standpoint, that we look to the procedures the U. S. Supreme Court established in *Batson,* supra.

I would hold, therefore, as a matter purely of state constitutional law, that equal protection of the law in the context of OCGA § 16-13-30 (d) requires that the prosecution be required, when a defendant has made a prima facie showing sufficient to raise an inference of unequal application of the statute, to "demonstrate that 'permissible racially neutral selection criteria and procedures have produced the monochromatic result.' [Cit.]" *Batson,* supra at 94. And I would hold further that the showing made by appellant in the present case was sufficient to shift the burden to the State.

3. Because appellant has made a sufficient showing of discriminatory application of OCGA § 16-13-30 (d) that the State should be required to give race-neutral reasons for the "monochromatic" application of that statute in Hall County, this court should vacate the life sentences and remand this case to the trial court for a hearing. At such a hearing, should the trial court find that the prosecution could not provide race-neutral reasons for the "monochromatic result" of the application of OCGA § 16-13-30 (d) in Hall County, sentencing for the offenses involved would still be permissible, but not with the aggravation of punishment authorized by OCGA § 16-13-30 (d). On the other hand, should the trial court find that the State has provided appropriate race-neutral reasons, the life sentences would be reimposed, whereupon appellant would be entitled to a new appeal.

Just as the prosecution was reined in by *Batson,* it must also be reined in here and called upon to give an account of itself. The statistics offered in this case show an enormous potential for injustice, and those statistics are just like the tip of an iceberg, with the bulk lying below the surface, yet to be realized. And unless we reveal or expose this massive obstacle that lies in the shipping lanes of justice, it will, just like an iceberg, tear a gaping hole in the ship of state, just as a gaping hole was ripped in the Titanic. Unless we detect it and steer clear of it, it will rip a hole in the legal bulwark of the ship of state and cause great calamity and destruction. We can ill afford to fail to keep a proper lookout or to fall asleep at the wheel when such a patent disaster awaits us: as with peremptory strikes, where it took 21 years from the detection of the iceberg of injustice in *Swain v. Alabama* to the beginning of its destruction in *Batson,* many injustices will be done and the integrity of the legal process will be scuttled.

Because I am convinced that appellant has made a sufficient showing of discriminatory application of OCGA § 16-13-30 (d) that the State should be required to give race-neutral reasons for the "monochromatic" application of that statute in Hall County, I respectfully dissent from the majority's rejection of appellant's claim.

I am authorized to state that Justice Sears joins in this dissent.

DECIDED MARCH 30, 1995 —
RECONSIDERATION DENIED APRIL 21, 1995.

*Summer & Summer, Daniel A. Summer, Thomas J. Killeen,* for appellant.

*Lydia J. Sartain, District Attorney, Thomas A. Gump, Assistant District Attorney, Michael J. Bowers, Attorney General, Susan V. Boleyn, Senior Assistant Attorney General, Paula K. Smith, Assistant Attorney General,* for appellee.

*John R. Martin,* amicus curiae.