S98P0624. PERKINS v. THE STATE.
(505 SE2d 16)

FLETCHER, Presiding Justice.

A jury convicted David Perkins of the murder of Herbert D. Ryals, III, and he was sentenced to death.[1] The jury found as aggra-

---

[1] The crimes occurred on August 13, 1995. The grand jury indicted Perkins on November 8, 1995, the same day that the state filed its notice of intent to seek the death penalty. The trial took place from June 23-28, 1997. On June 27, 1997, the jury convicted Perkins of malice murder, felony murder, and two counts of possession of a knife during the commission of a felony. The following day the jury recommended a death sentence for the murder. The trial court sentenced the defendant to death for the malice murder, and vacated the felony murder conviction. The trial court also merged one count of possession of a knife during

vating circumstances that the murder was committed while the defendant was engaged in the commission of an aggravated battery and was outrageously and wantonly vile, horrible, and inhuman in that it involved depravity of mind and an aggravated battery to the victim.[2] Perkins contends that the Clayton County district attorney engages in gender bias by seeking the death penalty exclusively against men. Because Perkins' statistical evidence fails to show selective prosecution in his case, we affirm.

The evidence shows that David Perkins had an argument with his wife, Gail, on August 12, 1995. She left their apartment to spend the night with her mother-in-law. Angry, Perkins remarked to a friend about the full moon and said "something's going to go down tonight." Perkins bought a bottle of whiskey and, around midnight, invited a neighbor, Herbert Ryals, to his apartment to drink and play guitars. Perkins and Ryals had met only once previously. Perkins is 6' 2" and weighed 220 pounds; Ryals was 5' 9" and weighed 170 pounds.

At 5:00 a.m., Perkins called his wife and asked her to bring some cigarettes to their apartment. Perkins met Gail outside the apartment and told her not to scream or "freak out." Once inside, Gail observed numerous bloodstains in the apartment and the victim, with visible stab wounds, lying motionless on the bathroom floor. Perkins pulled a knife from his pocket and told her that he would kill her if she tried to call the police. Gail left the apartment after promising Perkins that she was going to buy cigarettes. Instead, she called the police and reported a stabbing. Gail described the scene at her apartment and her husband's violent behavior to the responding officers and told them that they would need "more units." After more officers arrived, the police followed Gail to her apartment, where she gave them a key. The officers entered the apartment and discovered the victim's body in the same bloody condition as described by Gail Perkins.

Perkins was arrested two hours later when he returned to the apartment. While he was being handcuffed, he told the police that he had been watching them for over an hour. No one observed any marks, bruises, or cuts on the defendant, and Perkins did not request any medical treatment. During booking, Perkins mumbled, "[the victim] hit me with his guitar, I hit back, so I hit him back, I think he's

the commission of a felony into the other count and imposed a consecutive five-year sentence. Perkins filed a motion for a new trial on July 22, 1997, and an amended motion for new trial on November 17, 1997. The trial court denied the motion on November 20, 1997. Perkins filed his notice of appeal on December 18, 1997, and this case was docketed on January 9, 1998. Oral argument was held on April 21, 1998.

[2] OCGA § 17-10-30 (b) (2) and (b) (7).

dead, I know he's dead." Perkins then became violent toward the booking officer and had to be further restrained. A neighbor testified that Perkins had knocked on her door before his arrest, asked for a cigarette, and said, "I've just killed someone and I'm going to jail for the last time."

The state presented an expert on blood spatter who testified that the blood droplets and smears indicated that the victim had been initially assaulted in the living room and had fled, wounded and still under attack, through the kitchen and bedroom and into the bathroom. A broken liquor bottle in the bedroom indicated that the victim had been struck there with the bottle, and damage to the bathroom door showed that the victim had tried to barricade himself inside the bathroom but the door had been forced open from the outside. The victim was found lying on his side in the bathroom, curled into a fetal position.

The medical examiner testified that there were eleven stab or cut wounds on the victim. A stab wound in the center of the chest had been delivered with such force that the knife had damaged the heart. There were five stab wounds to the back, including three that had pierced the victim's lungs. Two ribs were fractured by the force used to inflict these wounds. There were also wounds on the victim's arms, shoulder, finger, and nose. Based on the depth of the stab wounds, the doctor estimated that the knife used to inflict the wounds had a blade length of five inches. The doctor further noted a serious blunt force injury to the victim's left eye; the blow was so severe that the skull had fractured and skull fragments were forced into the victim's brain. This wound was consistent with being struck by a liquor bottle. The victim also had a series of parallel bruises on his chest that matched the frets on a guitar found in the living room. Although several of the stab wounds could have been fatal, the doctor testified that none of the wounds had been immediately fatal and that the victim could have lived for ten minutes after being injured. The blood spatter throughout the apartment and on the victim's clothing showed that the victim had been conscious and either standing or sitting when the wounds had been inflicted.

To show motive, the state presented evidence that the victim's wallet was missing and that Perkins had spent the last of his money to purchase liquor the day before the murder. A former inmate also testified that Perkins had boasted in jail about hiding incriminating evidence, including the victim's wallet and identification. Perkins claimed self-defense. He testified that the victim suddenly and without reason hit him with a guitar, so he drew the knife he always wore on his belt and "just started sticking." The knife was never recovered; Perkins claimed that he lost it that night.

1. After reviewing the evidence in the light most favorable to the

jury's determination of guilt, we conclude that a rational trier of fact could have found Perkins guilty of the crimes charged beyond a reasonable doubt.[3]

2. Perkins filed a plea in bar to prevent the Clayton County district attorney's office from seeking the death penalty in his case because of alleged gender discrimination. Perkins claims that the Clayton district attorney only seeks the death penalty against men and that this alleged gender bias violates the state and federal constitutions. Perkins submitted evidence showing that the Clayton County grand jury had indicted 73 men and 11 women for murder and the district attorney had sought the death penalty against nine men and no women from 1985 until 1995, when he was charged with murder. Perkins also introduced the records of the female murder defendants to show that statutory aggravating circumstances existed in those cases to warrant the seeking of the death penalty.

Perkins has the burden on an equal protection claim to prove the existence of purposeful discrimination and its discriminatory effect on him.[4] In order to prevail, Perkins must prove "that the decision-makers in *his* case acted with discriminatory purpose."[5] We conclude that Perkins' meager statistics are insufficient to show selective prosecution because they do not provide any evidence specific to his own case that support an inference that gender considerations played a part in the district attorney's decision to seek the death penalty against him.[6] Further, although Perkins requests that we create a *Batson*[7]-like rule that would require the state to explain its reasons for seeking the death penalty, policy considerations behind a prosecutor's discretion argue against requiring district attorneys to defend their decisions to seek a death sentence.[8] The U.S. Constitution and Georgia law authorize the death penalty for Perkins' crimes and Perkins has failed to show that the state acted in an unconstitutional manner with respect to his case.[9] The trial court did not err by denying Perkins' plea in bar.

3. Perkins challenges the issuance of a search warrant for his apartment by claiming that the issuing magistrate had insufficient information to determine probable cause. Before obtaining the search warrant, the police had entered the apartment at 6:00 a.m., secured the crime scene, and seized evidence that was in plain view. The

---

[3] *Jackson v. Virginia*, 443 U.S. 307 (99 SC 2781, 61 LE2d 560) (1979).

[4] *Stephens v. State*, 265 Ga. 356, 357 (456 SE2d 560) (1995); *McCleskey v. Kemp*, 481 U.S. 279, 292 (107 SC 1756, 95 LE2d 262) (1987).

[5] *Stephens*, 265 Ga. at 357, quoting *McCleskey*, 481 U.S. at 292.

[6] See *Rower v. State*, 264 Ga. 323 (443 SE2d 839) (1994).

[7] *Batson v. Kentucky*, 476 U.S. 79 (106 SC 1712, 90 LE2d 69) (1986).

[8] *Stephens*, 265 Ga. at 359.

[9] See *Jenkins v. State*, 269 Ga. 282, 285 (498 SE2d 502) (1998); *Rower*, 264 Ga. at 323.

entry without a warrant and seizure of items in plain view were permissible under either the consent or exigent circumstances exceptions since the defendant's wife had reported a stabbing, asked the police to enter the apartment, and given them a key to the front door.[10] The search warrant was issued at approximately 1:00 p.m. on the same day to enable the officers to conduct a more detailed search of the apartment. The supporting affidavit for the search warrant recited that a dead white male with multiple stab wounds had been found in the defendant's apartment and that the defendant had been charged with murder. Based on these facts, the affidavit was clearly sufficient to support the magistrate's finding of probable cause.[11]

4. Perkins claims that the trial court erred by allowing hearsay statements by his wife to be admitted under the necessity exception to the hearsay rule.[12] On the day of the murder, Gail Perkins described the threatening behavior of her husband and the bloody condition of the apartment to Riverdale Police Officer Johanne Welch, who was the first officer to respond to the 911 call. One hour later, Gail Perkins described to Riverdale Police Chief Ron Bedingfield in greater detail the crime scene, her husband's demeanor, his brandishing of the knife, and his refusal to allow her to get help for the victim. At trial, however, Gail Perkins exercised the marital privilege and refused to testify.[13] The trial court ruled that Gail Perkins' statements to the police were admissible under the necessity exception to the hearsay rule, and Welch and Bedingfield subsequently testified about Gail's statements to them on the day of the murder.

To qualify as a necessity exception to the hearsay rule, there must be a necessity for the exception and a circumstantial guaranty of the testimony's trustworthiness.[14] The state demonstrated necessity by showing that Gail Perkins was unavailable as a witness and the only eyewitness to key evidence, such as Perkins' demeanor after the murder and his display of the probable murder weapon, which was never recovered.[15] Other factors support the guaranty of trust-

---

[10] See *Crowe v. State*, 265 Ga. 582, 587 (458 SE2d 799) (1995) ("A valid consent obviates the need for a search warrant."); *Gilreath v. State*, 247 Ga. 814, 820 (279 SE2d 650) (1981) ("'Numerous state and federal cases have recognized that the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid.'").

[11] See *DeYoung v. State*, 268 Ga. 780, 786-787 (493 SE2d 157) (1997) (magistrate's task in determining if probable cause exists is simply to make a practical, common-sense decision that, based on the information in the supporting affidavit, there is a fair probability that evidence of a crime will be found in a particular place).

[12] See OCGA § 24-3-1 (b).

[13] See OCGA § 24-9-23 (a).

[14] *Drane v. State*, 265 Ga. 663, 664 (461 SE2d 224) (1995); *Higgs v. State*, 256 Ga. 606, 607 (351 SE2d 448) (1987).

[15] See *Higgs*, 256 Ga. at 608.

worthiness. Gail Perkins made the statements to the two law enforcement officers within two hours of her observations; physical evidence and other witnesses corroborated her description of the crime scene; and she has never attempted to recant or disavow her statements.[16] Because there is both a necessity for the statements and a guaranty of their trustworthiness, Gail Perkins' hearsay statements were properly admitted.

5. The trial court's instruction to the jury on the definition of aggravated battery was not error.[17] The trial court was not required to define for the jury the meaning of "seriously" with regard to the phrase "seriously disfiguring the person's body or a body part,"[18] nor did the trial court err by instructing the jury that the "disfigurement may be temporary."[19]

6. Perkins argues that the facts are insufficient to support a finding of aggravated battery and depravity of mind under the (b) (2) and (b) (7) aggravating circumstances. The standard on the sufficiency of the evidence to support the finding of a statutory aggravating circumstance is the same as the standard for the sufficiency of the evidence to support a conviction under *Jackson v. Virginia*.[20] Viewed in the light most favorable to the prosecution,[21] the evidence was sufficient to authorize a rational trier of fact to find that Perkins invited the victim to his apartment, attacked him without provocation, chased him through the apartment, and continued inflicting wounds until Ryals died. The victim suffered numerous, severe injuries before death, including multiple stab wounds that pierced the heart and lungs, a broken sternum, fractured ribs, and a fractured skull. The victim was conscious when receiving these wounds and may have lived as long as ten minutes after they were inflicted. The evidence was sufficient to support a finding of aggravated battery and depravity of mind beyond a reasonable doubt.

7. Perkins' death sentence was not imposed as the result of impermissible passion, prejudice, or other arbitrary factor.[22] The death sentence is also not excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the

---

[16] See *Luallen v. State*, 266 Ga. 174, 179 (465 SE2d 672) (1996); *Higgs*, 256 Ga. at 608.

[17] See OCGA § 16-5-24 (a); *Roundtree v. State*, 227 Ga. App. 777 (490 SE2d 526) (1997).

[18] See *Levin v. State*, 222 Ga. App. 123, 127-128 (473 SE2d 582) (1996) (instruction that jury must decide whether disfigurement is "serious" is correct statement of the law).

[19] Id. at 127-128; *In the Interest of H.S.*, 199 Ga. App. 481 (405 SE2d 323) (1991) (aggravated battery does not require that disfigurement be permanent).

[20] *Raulerson v. State*, 268 Ga. 623, 632 (491 SE2d 791) (1997).

[21] See, e.g., *Carr v. State*, 267 Ga. 547 (480 SE2d 583), cert. denied, ___ U.S. ___ (118 SC 313, 139 LE2d 242) (1997); *Newland v. State*, 258 Ga. 172 (366 SE2d 689), cert. denied, 488 U. S. 975 (109 SC 514, 102 LE2d 549) (1988); *Jefferson v. State*, 256 Ga. 821 (353 SE2d 468) (1987); *Conner v. State*, 251 Ga. 113 (303 SE2d 266) (1983).

[22] See OCGA § 17-10-35 (c) (1).

defendant.[23] The similar cases listed in the appendix support the imposition of the death penalty in this case, in that all involve a deliberate killing with an aggravated battery to the victim before death or the depravity of mind of the defendant.

8. This Court has previously held that execution by electrocution is not unconstitutional.[24]

*Judgment affirmed. All the Justices concur.*

APPENDIX.

*Waldrip v. State*, 267 Ga. 739 (482 SE2d 299) (1997); *Carr v. State*, 267 Ga. 547 (480 SE2d 583) (1997); *Crowe v. State*, 265 Ga. 582 (458 SE2d 799) (1995); *Todd v. State*, 261 Ga. 766 (410 SE2d 725) (1991); *Taylor v. State*, 261 Ga. 287 (404 SE2d 255) (1991); *Wade v. State*, 261 Ga. 105 (401 SE2d 701) (1991); *Newland v. State*, 258 Ga. 172 (366 SE2d 689) (1988); *Jefferson v. State*, 256 Ga. 821 (353 SE2d 468) (1987); *Conner v. State*, 251 Ga. 113 (303 SE2d 266) (1983); *Smith v. State*, 249 Ga. 228 (290 SE2d 43) (1982); *Krier v. State*, 249 Ga. 80 (287 SE2d 531) (1982).

DECIDED SEPTEMBER 21, 1998.

*Thomas M. Martin*, for appellant.

*Robert E. Keller, District Attorney, Clifford A. Sticher, Erman J. Tanjuatco, David B. Hornsby, Assistant District Attorneys, Thurbert E. Baker, Attorney General, Christopher L. Phillips, Assistant Attorney General, Susan V. Boleyn, Senior Assistant Attorney General*, for appellee.

---

[23] See OCGA § 17-10-35 (c) (3).

[24] *DeYoung*, 268 Ga. at 786; *Wellons v. State*, 266 Ga. 77, 91 (463 SE2d 868) (1995).