### 40313. SIMS v. THE STATE.

GREGORY, Justice.

The defendant was convicted of the murder of her husband, Marshall Sims, and sentenced to life imprisonment.

The evidence at trial indicated the couple had a turbulent relationship during their three-year marriage and had separated on at least two occasions. At the time of the victim's death the couple had recently effected a reconciliation. The defendant had taken a leave of absence from her teaching position to work as the victim's secretary.

At trial the defendant testified that on the evening of the victim's death she returned to their home around 5:30 p. m. from a psychiatrist's appointment. She declined the victim's request to prepare dinner, stating she had some work to finish at the office. She returned to the office and completed the work within a few minutes. En route home she passed the victim in his car, headed in the direction of his office.

At home the defendant's 11-year-old son informed her that he and the victim had quarreled over the child's failure to perform certain household tasks assigned to him. As punishment the victim had forbidden the child to spend the night with a friend even though the defendant had previously given her permission. The defendant's son testified that his mother stated "[the victim] is not going to do you this way because I told you you could go."

The defendant testified she returned to the victim's office determined to discuss the differences the couple had over disciplining the defendant's son.[1] She found the victim in his woodshop, located on the floor directly above his office. The defendant testified the victim was "in a rage" over the impending break-up of his law firm. According to the defendant the victim threw her to the floor, struck her "four or five" times and told her he was seeing, and would continue to see, other women. The victim then told her, "go home and get the gun. I'll put you out of your misery."

The defendant testified her psychiatrist had previously instructed her to "obey . . . the absurd demands [the victim] made when he would go into a rage" on the theory that he would see how "stupid" his demands were and "would calm down." Following this

---

[1] Other evidence indicated the couple had quarreled in the past over methods of raising and disciplining the defendant's son.

advice, the defendant testified she returned home, located the victim's .38 caliber pistol and drove back to the office. The victim was still angry. According to the defendant the victim pinned her down on her back against the top of a tablesaw and raised a large board above her to strike her. The defendant testified the gun discharged as she raised her arm to protect herself from the blow.

A firearms examiner gave his opinion, based on the absence of gunpowder particles on the victim's clothing, that the fatal shot had been fired from a distance of at least 30 inches. The medical examiner testified that the fatal shot entered the victim's left chest, traversed the media sternum and down through the right lung before exiting the body. Based on the trajectory of the bullet, the State argued it would have been impossible for the defendant to have fired the fatal shot from a supine position.

1. The evidence at trial authorized the jury to find the defendant guilty of murder beyond a reasonable doubt. Jackson v. Virginia, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. In response to defendant's request to charge the law of accident and misfortune, the trial court charged OCGA § 16-2-2 (Code Ann. § 26-602), "A person shall not be guilty of any crime committed by misfortune or accident where it satisfactorily appears there was no criminal scheme or undertaking, intention or criminal negligence." In conjunction with this charge the trial court gave the jury the definition of criminal negligence which, defendant agrees, was legally correct. Defendant argues, however, that the trial court erred in charging the law of criminal negligence as the jury may have believed a finding of criminal negligence would have authorized a conviction of murder. We do not agree.

The trial court's charge was a correct statement of the law. We do not think the jury would have been misled by the definition of criminal negligence given as part of the charge on accident or misfortune. Rather, the trial court's instruction simply followed OCGA § 16-2-2 (Code Ann. § 26-602). Death caused by accident is not a crime. Death caused by criminal negligence is not an accident. The trial court quite properly defined criminal negligence to enable the jury to apply the charge on accident to the facts as they might be found to exist. We find no error.

3. Prior to trial the trial court granted the State's motion in limine to prevent the defendant from referring, at any time during trial, to the victim's past specific acts of violence toward the defendant, until the defendant had made a prima facie case of present assault by the victim from which the defendant sought to defend herself. Subsequently defense counsel sought a ruling on whether he could refer in his opening statement to specific acts of

violence perpetrated by the victim on the defendant which the counsel expected to prove at trial. The trial court ruled that in his opening statement defense counsel could make general references to acts of violence committed by the victim, but precluded him from disclosing the details of these incidents until a proper foundation was laid under *Milton v. State,* 245 Ga. 20 (262 SE2d 789) (1980).[2]

Defendant complains that this restriction denied her the right to a fair trial. We agree with defendant's assertion that the opening statement is of no small significance in that it outlines for the jury what a party intends to show at trial. However, we hold that the trial court has a sound discretion to control the content of the opening statement of either party, particularly with regard to matters of questionable admissibility. *Poteat v. State,* 251 Ga. 87 (303 SE2d 452) (1983); *American Employer Ins. Co. v. Johns,* 122 Ga. App. 577 (178 SE2d 207) (1970). See also, *Brown v. State,* 250 Ga. 862 (2) (302 SE2d 347) (1983); Shulman, *Georgia Practice and Procedure* (4th Ed.) § 14-5, pp. 224-7. We do not find that the trial court abused its discretion in this case.

4. Prior to trial defendant filed, under OCGA § 24-10-26 (Code Ann. § 38-801),[3] a notice to produce, inter alia, "all photographs, physical evidence and documents (or other writings) in the possession of and intended for use by the prosecution as evidence at trial." The defendant argues that the State's failure to disclose diaries and certain crime scene photographs under this notice to produce violated due process.

While the notice to produce provisions of OCGA § 24-10-26 (Code Ann. § 38-801) are applicable to criminal cases, *Brown v. State,* 238 Ga. 98, 101 (231 SE2d 65) (1976), a *"notice to produce* cannot be used to enable defense counsel to examine, in advance of trial or evidentiary hearing, the contents of the district attorney's file." *Wilson v. State,* 246 Ga. 62, 64-5 (268 SE2d 895) (1980). In a criminal case a notice to produce pursuant to OCGA § 24-10-26 (Code Ann. § 38-801) may compel the production of books, documents or tangible

---

[2] While the reputation of a victim for violence is generally irrelevant and inadmissible, when there is a prima facie showing that the deceased was the assailant, the deceased assailed the defendant and the defendant was honestly seeking to defend himself, the deceased's general reputation for violence may be admitted. *Milton v. State,* 245 Ga. 20, 22, supra.

[3] OCGA § 24-10-26 (Code Ann. § 38-801) provides, in pertinent part, "Where a party desires to compel production of books, writings or other documents or tangible things in the possession, custody or control of another party . . . the party desiring the production may serve a notice to produce upon counsel for the other party . . ."

things in the State's possession "where such books, etc., would be admissible and *are needed for use as evidence on behalf of the defendant.*" 246 Ga. at 64. (Emphasis supplied.)

(a) The diaries which defendant claims were wrongfully withheld from her were used by the State on cross-examination to impeach the defendant's testimony. It is clear from the record that the defendant's diaries were not needed by her as evidence in support of her defense. The defendant's motion to suppress the diaries demonstrates this lack of necessity. Further, when the State made it known, during cross-examination of the defendant, that it was in possession of the diaries, the trial court recessed the trial so that defense counsel could have an opportunity to examine the diaries overnight.

(b) Nor did the notice to produce reach those crime scene photographs which the State did not offer in evidence. By its terms defendant's notice to produce requested only those "photographs . . . intended for use by the prosecution as evidence at trial." Those photographs which the State offered in evidence were given to the defendant. We point out that, pursuant to the defendant's Brady motion, the trial court conducted an in-camera inspection of these photographs and determined they were not exculpatory.

(c) Nor do we find that defendant had a right to independent expert examination of either the diaries or photographs under *Sabel v. State,* 248 Ga. 10 (282 SE2d 61) (1981). *Sabel* permits a criminal defendant "on motion timely made to have an expert of his choosing, bound by appropriate safeguards imposed by the court, examine critical evidence whose nature is subject to varying expert opinion." 248 Ga. at 17-18. At trial the defendant admitted she had made each entry in the diaries. On appeal she raises no issue necessitating an expert opinion as to their validity. We decline to extend *Sabel* to the examination of photographs unless there is some showing that an expert analysis of the photographs relates to a critical matter which is subject to varying expert opinion. It is not enough to assert that expert analysis might produce evidence helpful to the defense, i. e., to embark on a "fishing expedition."

5. Defendant argues the trial court erred in refusing to allow a psychiatrist to testify to statements made by the victim during joint counseling sessions which both the defendant and the victim attended. Defendant maintains that her presence, as a third party, vitiates the otherwise privileged communications between the victim and psychiatrist. Communications between husband and wife and between psychiatrist and patient are protected under OCGA § 24-9-21 (Code Ann. § 38-418). While it is true, as defendant suggests,

that the presence of a third party will sometimes destroy the privileged nature of communications, see *Richards v. State,* 56 Ga. App. 377 (192 SE 632) (1937)[4] and *Knight v. State,* 114 Ga. 48 (39 SE 928) (1901),[5] we join the weight of authority from other jurisdictions in holding that there is a strong public policy in favor of preserving the confidentiality of psychiatric-patient confidences where a third party is present as a necessary or customary participant in the consultation and treatment. McCormick, *Evidence* (2nd Ed.) § 101, p. 216; Ellis v. Ellis, 472 SW2d 741 (Ct. App. Tn. 1971); Grosslight v. Superior Court of Los Angeles, 72 Cal. App. 3d 502 (140 Cal. Reptr. 278) (1977). See also, Bassil v. Ford Motor Co., 278 Mich. 173 (270 NW 258) (1936); 107 ALR 1491, 1493. The public policy in favor of protecting these confidences is strengthened when the third party is the communicant's spouse, in which case the communicant may also invoke the marital privilege under OCGA § 24-9-21(1) (Code Ann. § 38-418).

It is clear from the defendant's testimony that she and the victim were jointly seeking psychiatric counseling for marital problems.[6] As such we find that the victim was a necessary participant in the psychiatric sessions and his communications to the psychiatrist were entitled to protection. This privilege survives the death of the communicant. *Boggess v. Aetna Life Ins. Co.,* 128 Ga. App. 190 (196 SE2d 172) (1973); Agnor, *Georgia Evidence,* § 6-4 (1976).[7] The presence of the victim's spouse, also a necessary participant in the treatment, does not destroy the privilege. The trial court did not err in refusing to allow the psychiatrist to testify to the victim's communications.

6. Defendant argues the trial court erred in denying her motion

---

[4] Here it was held that a special prosecutor present during a conference between the defendant and his attorney could testify to their communications.

[5] In this case a witness who overheard a wife exclaim to her husband that the husband had killed a man was permitted to testify against the husband on the trial of the murder case.

[6] The defendant testified that she sought private counseling for depression and treatment of her marital problems. At times the victim would accompany her to these sessions for joint treatment of the couple's marital difficulties.

[7] The issue of the State's standing to assert the privilege is not raised. There is authority for the proposition that only the personal representative of the communicant or the psychiatrist may assert the privilege after the communicant's death. 81 Am Jur 2d 265, Witnesses, § 236, p. 265; Federal Practice Standard 504. Other jurisdictions hold that the trial court has a discretion to invoke the privilege on its own motion in the communicant's absence, McCormick, Evidence (2d Ed.) § 102, p. 218.

to suppress her diaries. Following the victim's death a G. B. I. agent obtained permission from one of the victim's former law partners and owner of the building to search the building in which the victim's body was found. During a search of a storage room in the law firm, the agent found defendant's diaries in an uncovered basket on the floor of the storage area. On top of the basket were some newspaper clippings. The agent testified that the storage area was in "disarray." Other than defendant's diaries the room held "boxes of materials, old chairs, desks, lumber, pieces of wood . . . old pictures lying on the floor, newspapers, just a lot of everything." There was testimony indicating that this area was used by members of the firm to maintain "abstract files, retired files and supplies." Defendant testified she had received permission from the victim to store some of her personal belongings there.

Defendant concedes that the G. B. I. had authority, pursuant to the law partner's consent, to search the storage area. She maintains, however, that her husband's former law partner had no authority to consent to a search of her diaries.

The U. S. Supreme Court has held that in determining whether the Fourth Amendment applies to suppress the fruits of a search, the courts must ask "not merely whether the defendant had a possessory interest in the items seized, but whether he had an expectation of privacy in the area searched." United States v. Salvucci, 448 U. S. 83, 93 (100 SC 2547, 65 LE2d 619) (1980). Factors to be considered in evaluating whether a justifiable expectation of privacy exists include whether the accused has a right to exclude others from the place searched; whether he has a possessory interest in the items seized; and whether he took normal precautions to maintain the privacy and security of the items seized. Rawlings v. Kentucky, 448 U. S. 98 (100 SC 2556, 65 LE2d 633) (1980); United States v. Haydel, 649 F2d 1152 (5th Cir. 1981). See also, LaFave, Search and Seizure, § 2.1 (1978). Defendant here points out that "[c]ommon experience of life, clearly a factor in assessing the existence and the reasonableness of privacy expectations, surely teaches all of us that the law's 'enclosed spaces' — mankind's valises, suitcases, footlockers, strong boxes, etc. — are frequently the objects of his highest privacy expectations. . . ." United States v. Block, 590 F2d 535, 541 (4th Cir. 1978). With this statement we concur. See, United States v. Wilson, 536 F2d 883 (9th Cir. 1976); United States v. Blok, 188 F2d 1019 (D. C. Cir. 1951). We agree that one has a reasonable expectation of privacy in the contents of a covered shoebox hidden under a bed in his parents' home. United States v. Haydel, 649 F2d 1152 (5th Cir. 1981). We also agree that one who deposits a package in the United States Mail has a reasonable expectation of privacy in the nondisclosure of its contents. Walter v.

United States, 447 U. S. 649 (100 SC 2395, 65 LE2d 410) (1980).

These cases differ, however, from the situation where a person places an unlocked diary in an open box[8] on the floor of a storage area to which an undetermined number of persons have access. The defendant did not secure her diaries in an "enclosed space" such as a valise, footlocker or strong box. Rather the diaries were casually placed[9] in an unenclosed space. Nor did the diary itself have a lock which would shield it from the uninvited eye. Under these circumstances we find the defendant had no reasonable expectation of privacy in the content of the diaries. They were made available for the perusal of any person who entered the storage area. Therefore, we find that the trial court did not err in denying the motion to suppress.

*Judgment affirmed. All the Justices concur, except Hill, C. J., disqualified.*

DECIDED JANUARY 4, 1984 —
REHEARING DENIED JANUARY 25, 1984.

*Garland, Nuckolls & Catts, Edward T. M. Garland, Donald F. Samuel, Steven H. Sadow,* for appellant.

*Johnnie L. Caldwell, Jr., District Attorney, Michael J. Bowers, Attorney General, Eddie Snelling, Jr.,* for appellee.

---

[8] The G. B. I. agent testified the box in which the diaries were found had open, latticework sides.

[9] The G. B. I. agent testified the diaries appeared to have been "thrown-in" the box.