S98P0790. SMITH v. THE STATE.

(510 SE2d 1)

HINES, Justice.

David Phillip Smith was convicted of the malice murder of Jeremy Javies as well as theft by receiving stolen property and possession of a firearm during the commission of a felony.[1] The jury recommended a death sentence, finding as aggravating circumstances that the murder was committed while the defendant was engaged in the commission of an aggravated battery; and that the murder was outrageously and wantonly vile, horrible, and inhuman in that it involved an aggravated battery to the victim and torture. OCGA § 17-10-30 (b) (2); (b) (7). Smith appeals his convictions and sentences. Because Smith was prevented from introducing relevant evidence in the guilt/innocence phase, we reverse Smith's convictions for murder and possession of a firearm during the commission of a felony. We affirm his conviction for theft by receiving stolen property.

The evidence presented at trial showed that Smith purchased a sawed-off 12-gauge shotgun from an acquaintance who had stolen

---

[1] Jeremy Javies was killed on March 22, 1995. Smith was indicted on August 10, 1995, for malice murder, felony murder (4 counts), theft by receiving stolen property, and possession of a firearm during the commission of a felony. The State filed a notice of intent to seek the death penalty on July 14, 1995. The trial took place from January 13-24, 1997. On January 22, 1997, the jury convicted Smith on all counts, and on January 24, 1997, the jury recommended a death sentence for the malice murder. The trial court sentenced Smith to death for the malice murder, and vacated the felony murder convictions. The trial court also sentenced Smith to ten years for theft by receiving stolen property, concurrent with the death sentence, and five years for possession of a firearm during the commission of a felony, consecutive to the theft sentence. Smith filed a motion for new trial on February 4, 1997, and an amended motion for new trial on November 13, 1997. The trial court denied the amended motion for new trial on December 22, 1997, and Smith filed his notice of appeal on January 20, 1998. This case was docketed on February 18, 1998, and orally argued on June 8, 1998.

the gun during a burglary. Smith also had a sawed-off 16-gauge shotgun. On March 22, 1995, Smith went to the home of a friend, Jeremy Javies, who was 16 years old, and got into an argument with Javies on the front porch. Javies' mother heard the argument but could not discern what they were arguing about. After the argument, Javies came inside and told his mother, "You don't have to worry about seeing David come over here no more because I told him if he didn't get rid of the guns that you was gonna go to the police."

Later that night, Smith and Javies went into the woods with the shotguns. Neighbors heard one shot, a pause of one-two minutes, and then a rapid series of additional shots. About 15 minutes later, Lamar Hopkins, an acquaintance of Smith, saw Smith walking on a nearby road carrying both shotguns in a blue book bag. Smith told Hopkins that he had just killed Javies, and Hopkins went with him to a place in the woods where he hid the shotguns. Two additional witnesses also saw Smith walking on the road carrying the book bag within minutes of the shooting. Hopkins further testified that Smith had been angry with Javies on the day before the shooting, and that Smith told him that he shot Javies because he was afraid that Javies was going to tell on him for possessing the shotguns.

Javies' body and the book bag containing the shotguns were found the following day. Javies had six and possibly seven gunshot wounds: four wounds to the arms and shoulders, a press-contact shot to the neck that had fractured the vertebrae, and one and possibly two press-contact shots to the face. All of the wounds were inflicted by a 12-gauge shotgun. At trial, Smith admitted shooting Javies, but claimed that Javies had first fired at him with the 16-gauge shotgun.

The evidence was sufficient to enable a rational trier of fact to find Smith guilty of the crimes charged beyond a reasonable doubt. *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

### Pretrial Issues

1. The trial court did not err by denying Smith's plea in bar to prevent the seeking of the death penalty in his case due to alleged gender discrimination by the Clayton County district attorney. *Perkins v. State*, 269 Ga. 791 (505 SE2d 16) (1998). Smith failed to show that the decision-makers in his case acted with discriminatory intent. See id.; *McCleskey v. Kemp*, 481 U. S. 279, 292 (107 SC 1756, 95 LE2d 262) (1987); *Stephens v. State*, 265 Ga. 356, 357 (1) (456 SE2d 560) (1995).

2. Smith complains that the State obtained improper access to his juvenile record during the discovery process for two reasons: 1) a detective viewed Smith's juvenile file in violation of OCGA §§ 15-11-58 and 15-11-59; and 2) a later juvenile court proceeding where the

State was given permission to copy portions of the file was outside the scope of the Unified Appeal Procedure ("UAP"). A defendant's juvenile court record is admissible as aggravation evidence in the sentencing phase of a capital trial. *Burrell v. State*, 258 Ga. 841, 844 (7) (376 SE2d 184) (1989); OCGA § 15-11-38 (b). The record shows that the detective complied with OCGA § 15-11-59 (c) because he obtained the consent of the juvenile court judge before examining Smith's file. Later, when the State wanted to copy portions of the file, it sought permission in a juvenile court hearing that Smith complains was invalid because it was outside the scope of the UAP. The UAP, however, is a mechanism designed to ensure that all legal issues are raised on behalf of a defendant and that the occurrence of error is minimized. UAP § I (A). It is not intended to bar legal proceedings outside the Superior Court that may be necessary for the litigation of a capital case. Therefore, we find no error.

### *Voir Dire*

3. The trial court did not err by excusing a prospective juror due to her inability to consider a possible death sentence. *Wainwright v. Witt*, 469 U. S. 412, 424 (105 SC 844, 83 LE2d 841) (1985); *Greene v. State*, 268 Ga. 47, 48 (485 SE2d 741) (1997).

### *The Guilt/Innocence Phase*

4. Smith argues that he was prevented from introducing evidence that was relevant to his claims of self-defense and voluntary manslaughter. We agree. At the start of the trial, the State filed a motion in limine to prevent Smith from presenting evidence or questioning witnesses regarding two incidents that occurred two days before the shooting. The State claimed that these two incidents were irrelevant and that they amounted to impermissible bad character evidence regarding the victim. OCGA § 24-2-2. The State also claimed that the defense violated Uniform Superior Court Rules 31.1 and 31.6 by failing to provide notice of its intent to introduce evidence of these incidents, because they were past violent acts by the victim. The trial court ruled that the incidents were irrelevant, and therefore inadmissible, because they occurred two days before the shooting. The trial court also ruled that the evidence was inadmissible due to Smith's failure to comply with Uniform Superior Court Rule 31.6.

The first incident involved a man, Troy Fitzgibbons, who had called the police and reported that he had seen Smith and the victim carrying sawed-off shotguns. The second incident involved an acquaintance of Smith, Steve McLendon, who was approached by Smith and the victim. Smith and Javies asked him if he would like to

join them in a scheme to shoot someone and take his money. During this solicitation, Smith and Javies each had a sawed-off shotgun. According to the defense proffer and the discovery that was made a part of the record, Fitzgibbons and McLendon gave written statements to the police concerning these incidents and both men were able to identify the shotguns found in the blue book bag as the shotguns carried by the defendant and the victim.

"The most acceptable test for relevancy is whether the evidence offered renders the desired inference more probable than it would be without the evidence. [Cits.]" *Southern R. Co. v. Lawson*, 256 Ga. 798, 802 (4) (353 SE2d 491) (1987). Smith's desired inferences were that Smith had no motive to murder Javies, and that Javies had fired at him first. The excluded evidence rendered Smith's desired inferences more probable because it supported Smith's claim that he and the victim had gone into the woods to test-fire *their* guns in anticipation of a robbery, rebutting the State's assertion that Smith had lured the victim into the woods to kill him so he could not report Smith's possession of the shotguns, and because it showed that the victim possessed one of the shotguns and therefore could have fired at Smith first. Without the testimony of Fitzgibbons or McLendon, the only witness able to place the 16-gauge shotgun in the victim's hands was the defendant; and the jury was likely to view his testimony as self-serving. This evidence was relevant.

Further, these two incidents were not subject to the notice provisions of Uniform Superior Court Rule 31.6. Rule 31.6 was created pursuant to *Chandler v. State*, 261 Ga. 402 (405 SE2d 669) (1991), which permitted a defendant claiming justification to introduce evidence of "specific acts of violence by a victim against a third party," provided the State is given pretrial notice. Id. at 407-408 (3). It is undisputed that Smith did not provide the State with pretrial notice of his intent to introduce evidence of the Fitzgibbons and McLendon incidents. Therefore, the relevant inquiry is whether carrying a sawed-off shotgun and soliciting a person to help commit a robbery and murder constitute "specific acts of violence by [Javies] against a third party." We conclude that they do not under the facts of this case because the State cannot point to a specific victim of these alleged acts of violence. The carrying of the shotgun was a possession offense, OCGA §§ 16-11-122 and 16-11-123, and the solicitation never proceeded to the selection of a victim and the carrying out of the plan. There was no evidence that anyone was harmed. See *Bennett v. State*, 265 Ga. 38, 40-41 (3) (453 SE2d 458) (1995) (victim's prior convictions for burglary not admissible under *Chandler* as previous acts of violence against a third party because there was no evidence that anyone was harmed); *Lowe v. State*, 267 Ga. 410, 414 (5) (a) (478 SE2d 762) (1996) (threats and menaces do not constitute previous acts of

violence under *Chandler*). The notice provisions of Uniform Superior Court Rule 31.6 therefore do not apply and, since we have already determined that the Fitzgibbons and McLendon incidents were relevant, the evidence should have been admitted. When additional evidence supporting Smith's defense is considered, including the presence of a spent shell in the 16-gauge shotgun and Hopkins' testimony that the victim had threatened to kill Smith the day before the shooting, we cannot say that the exclusion of this evidence was harmless. Accordingly, we reverse Smith's convictions for murder and possession of a firearm during the commission of a felony. Smith's conviction for theft by receiving stolen property is unaffected by any error in the guilt/innocence phase and is affirmed.

5. The victim's mother testified that Smith and her son had an argument on the day of the shooting on her front porch. Immediately afterwards, the victim came inside and told her, "You don't have to worry about seeing [the defendant] come over here no more because I told him if he didn't get rid of the guns that you was gonna go to the police." The defense challenged the admissibility of this statement on hearsay grounds but the trial court ruled that the statement was admissible as an excited utterance, OCGA § 24-3-3, and under the necessity exception. OCGA § 24-3-1 (b). After the victim's mother testified on direct examination, Smith sought to cross-examine her about her son's previous attempts to run away from home and about a Department of Family and Children Services ("DFACS") declaration that he was a "deprived child." Smith claims that these questions would show that the victim and his mother did not have a relationship of trust and confidence, thus creating doubt as to the credibility of the victim's statement to her. The trial court refused to permit this line of questioning, and Smith claims that this ruling was error.

Georgia law permits impeachment of the hearsay declarant. *Johnson v. State*, 169 Ga. 814, 825 (4) (152 SE 76) (1930); *Brantley v. State*, 177 Ga. App. 13, 15-17 (3) (338 SE2d 694) (1985). Although hearsay admitted through the excited utterance exception to the hearsay rule derives its credibility not from the declarant's veracity but from its relation to the transaction from which it springs, impeachment of the hearsay declarant is the only method by which a party can attack the accuracy of the statement, and ordinarily should be permitted. *Brantley*, supra at 16 (3). But the Court of Appeals noted in *Brantley* that Federal Rule of Evidence 806 allows the impeachment of a hearsay declarant by the introduction of relevant evidence which would be admissible for impeachment purposes if the declarant was in court. Id. at 17. In Georgia, impeaching a witness with evidence of specific bad acts or a juvenile record is not permitted. OCGA § 24-9-84; *Baynes v. State*, 218 Ga. App. 687, 690 (4) (463 SE2d 144) (1995); *Wetta v. State*, 217 Ga. App. 128, 130 (3) (456 SE2d

696) (1995). Therefore, the trial court did not err by refusing to allow Smith to cross-examine the witness about her son running away from home and his DFACS record.

6. Hopkins testified for the State that Smith had called him the day after the shooting and asked for his help in burning and burying the body. On cross-examination, Smith asked Hopkins if he had told the police about Smith's request, and Hopkins replied that he had. Smith then asked Hopkins to look through his written statement and oral statement transcript and show where he had told the police about this conversation. Hopkins' statements had not been admitted into evidence. The State objected, and the trial court ruled that Smith could not impeach Hopkins with his statements until they were tendered into evidence. This ruling was error. A prior inconsistent statement does not need to be admitted into evidence before it is used for impeachment purposes. *Duckworth v. State*, 268 Ga. 566, 568 (1) (492 SE2d 201) (1997). Since Smith's murder conviction is reversed on other grounds, we do not consider whether this error was harmful.

7. Smith is white; the victim was African-American. Hopkins testified that Smith had boasted about the shooting on the day after its occurrence and used a racial slur during this admission to describe the victim. The prosecutor mentioned this admission and slur in his opening statement and closing argument. When Smith cross-examined Hopkins, Smith tried to ask Hopkins if Hopkins was a racist and whether he carried a lighter with a rebel flag and "racist-type language" on it. After State objection, the trial court ruled that these questions were improper. Later, during Smith's direct examination, Smith sought to testify that he had dated an African-American girl but the trial court ruled that this line of inquiry was not relevant. Smith claims that he was prevented from overcoming State aspersions that he was racist and from proving that Hopkins had been the one who had uttered the racial comment.

As to the cross-examination of Hopkins, the trial court abused its discretion by preventing Smith from asking Hopkins whether he was a racist. Smith's questions to Hopkins about his alleged racism were an attempt to show that Hopkins had been the person who had uttered the racial statement, not Smith. Smith has the right to a thorough and sifting cross-examination, OCGA § 24-9-64, and whether Hopkins was a racist was relevant and material to a determination of who had made the racial comment. The trial court did not err, however, by refusing to allow questions about Hopkins' lighter. See *Duckworth*, supra at 567 (1) (trial court has discretion to limit the scope of cross-examination). Whether Hopkins had a rebel flag on his lighter would add little support for Smith's claim that

Hopkins had uttered the racial statement.[2]

As to Smith's direct examination, the trial court erred by preventing Smith from testifying that he had dated an African-American girl. Hopkins alleged that Smith had made an admission that included a racial slur. Smith was entitled to rebut this allegation by showing that he was not the type of person who would make such a statement, i.e., that he was not a racist. Since evidence that Smith had dated an African-American girl would tend to make this desired inference more probable, the evidence was relevant and should have been admitted. OCGA § 24-2-1; *Southern R. Co.*, 256 Ga. at 802 (4). We do not consider whether this error is harmful because Smith's murder conviction is reversed on other grounds.

8. Smith complains that the trial court improperly sustained repeated objections by the prosecutor to Smith's opening statement. We conclude from our examination of the record that the trial court did not abuse its "sound discretion to control the content of the opening statement." *Sims v. State*, 251 Ga. 877, 879 (3) (311 SE2d 161) (1984).

9. The trial court did not abuse its discretion by permitting the State to display images of photographs admitted into evidence on a 35-inch television screen. See *Ottis v. State*, 269 Ga. 151, 156 (4) (496 SE2d 264) (1998). The enlargement of photographs is permitted provided that there is no distortion of the objects pictured. Id. Although Smith objected that there may be some color distortion, the trial court compared the photographs with the TV images before ruling that the TV images were permissible as a demonstrative aid. We find no error.

10. The guilt/innocence phase jury charge was not error. "The words 'criminal negligence' are an integral part of the definition of a crime, and were properly included in the charge on OCGA § 16-2-1." *Owen v. State*, 266 Ga. 312, 315 (6) (467 SE2d 325) (1996). That the trial court further explained the meaning of criminal negligence in this context does not mean that the jury erroneously believed that Smith could be convicted if he acted negligently. The trial court thoroughly and extensively instructed the jury on the elements of malice murder, felony murder, voluntary manslaughter and self-defense. The jury charge, when viewed as a whole, did not mislead the jury. *Proctor v. State*, 235 Ga. 720, 726-727 (221 SE2d 556) (1975).

*Sentencing Phase*

11. Smith complains that the State argued improperly in the sentencing phase closing argument. He asserts that the prosecutor

---

[2] There was no proffer about what constituted the alleged "racist-type language."

minimized the importance of the jury's sentencing responsibility by informing the jury that their sentencing decision would be shared with an appellate court. *Caldwell v. Mississippi*, 472 U. S. 320 (105 SC 2633, 86 LE2d 231) (1985) (violation of Eighth Amendment for jury in capital trial to be led to believe that the responsibility for their sentencing decision rests elsewhere); *Prevatte v. State*, 233 Ga. 929, 930-933 (6) (214 SE2d 365) (1975). We agree.

The prosecutor began his sentencing phase closing argument by suggesting that justice demanded the death penalty in this case, and by reminding the jury several times of their "awesome responsibility" in making the sentencing decision. The prosecutor then continued:

> But remember that *in making your decision you are not alone*, there are others who have been involved in this decision *and there will be others after you who will also be involved.* There was the Legislature who passed this law based on being elected by their officials and there were the Grand Jurors who looked at these charges and there was the prosecution, the State, who brought these charges to you and indeed it will be the court who will charge you on the law and it will be the defense who will be responsible for defending the defendant in this case *and there will be those even after you* —

The defense objected, citing *Caldwell*, supra. The trial court asked the prosecutor what he meant by the "others after you." The prosecutor responded that there "will be the deputies who will be involved with carrying the defendant back and forth from wherever, there will be other people who will assemble the evidence." Later in the colloquy, the prosecutor stated that he had actually been referring to the Parole Board because parole was a consideration in a life sentence.[3] Although the trial court stated that "it is clear that the statement made by the prosecutor in this case could lead this jury down the road of the impression about what could happen if this case went up on appeal," it denied Smith's motion for mistrial. The trial court also declined to give curative instructions; instead, it required the prosecutor, upon the resumption of his argument, to clarify for the jury that he had meant the Parole Board when he had referred to the "others."

In *Caldwell*, the prosecutor, in remarks characterized by the United States Supreme Court as unambiguous and strong, "sought to minimize the jury's sense of responsibility for determining the appropriateness of death" by informing them that an appellate court would

---

[3] The trial court called this second, belated explanation "disingenuous."

review their sentencing decision. *Caldwell*, supra at 340-341 (IV and V). To establish a *Caldwell* violation, a defendant also must show that the prosecutor misled the jury by " 'improperly describ[ing] the role assigned to the jury by local law.' " *Carr v. State*, 267 Ga. 547, 557 (8) (a) (480 SE2d 583) (1997), quoting *Romano v. Oklahoma*, 512 U. S. 1, 9 (114 SC 2004, 129 LE2d 1) (1994). In this case, we conclude that the prosecutor did seek, in a misleading fashion, to diminish the jury's sense of responsibility. The meaning of the prosecutor's argument was clear: the "awesome responsibility" for the jury's decision to sentence Smith to death is shared with, and thus diluted by, other actors. This assertion is misleading: contrary to the prosecutor's argument, no one coming after the jury's sentencing decision, not this Court nor any "other," will ever become "involved" in their decision. This Court will review a death sentence for sufficiency of the evidence, OCGA § 17-10-35 (c) (2); proportionality, id. at (c) (3); whether the sentence was imposed under the influence of passion, prejudice, or other arbitrary factor, id. at (c) (1); and any errors enumerated by way of appeal, id. at (b); but this Court does not make the "highly subjective, 'unique, individualized judgment regarding the punishment that a particular person deserves.' " *Caldwell*, supra at 340 (IV) (C), n. 7; quoting *Zant v. Stephens*, 462 U. S. 862, 900 (II) (103 SC 2733, 77 LE2d 235) (1983) (Rehnquist, J., concurring in judgment). Only the jury, upon consideration of countless mitigating and aggravating factors, makes that decision.

In this case, "the inevitable [result] of the prosecutor's remarks . . . was to encourage the jury to attach diminished consequence to their verdict, and to take less than full responsibility for their awesome task of determining life or death for the prisoner[ ] before them." *Prevatte*, supra at 931 (6). The trial court erred by failing to issue curative instructions, and the prosecutor's subsequent explanation to the jury was inadequate to cure the error. See *Fleming v. State*, 240 Ga. 142, 146 (6) (240 SE2d 37) (1977) (extensive, clear corrective instructions required because this type of remark has an unusual potential for corrupting the death sentencing process). The prosecutor's argument was also not a passing or incidental reference to appellate review that could be cured by the jury charge. Compare *Moon v. State*, 258 Ga. 748, 756 (15) (375 SE2d 442) (1988). Therefore, had we not reversed the murder conviction in this case, this error would mandate a reversal of the death sentence.

12. Smith complains that the trial court erred by sustaining State hearsay objections to the testimony of two mitigation witnesses. Smith had lived in Oregon with his mother until he was five years old, when he came to Georgia to live with his father and stepmother. Smith's stepmother testified, when asked if she knew anything about his childhood living conditions in Oregon, that she had

received a letter from Smith's mother when Smith was five years old. She began to relate the contents of the letter but the trial court sustained a State hearsay objection.[4] Later, Smith's father explained that he had sought permanent custody based on what Smith had told him at that time about living in Oregon. When Smith's father started to testify about the substance of the conversation with his son, the trial court again sustained a State hearsay objection. Smith asserts that the trial court should not have excluded this evidence because evidentiary rules are relaxed in the sentencing phase of a capital trial. See *Green v. Georgia*, 442 U. S. 95, 97 (99 SC 2150, 60 LE2d 738) (1979) (hearsay rule must not be applied mechanistically in the sentencing phase of a capital trial to "defeat the ends of justice"); *Collier v. State*, 244 Ga. 553, 567 (11) (261 SE2d 364) (1979) (mitigation evidence that is ordinarily inadmissible must not be automatically excluded in the sentencing phase).

However, the hearsay rule is not suspended in the sentencing phase. *Davis v. State*, 263 Ga. 5, 9 (14) (426 SE2d 844) (1993); *Isaacs v. State*, 259 Ga. 717, 736-737 (37) (386 SE2d 316) (1989). The "unique circumstances" present in *Green* to support the reliability of the hearsay statements are not present in this case, *Green*, 442 U. S. at 97 (accomplice's confession to a close friend that he had been the shooter was a statement against interest, was corroborated by other evidence, and was used at the accomplice's trial to convict him), and the defense made no proffer to enable us to determine if the potential mitigating influence of the excluded testimony outweighed the harm from a violation of the hearsay rule. See *Collier*, supra. We cannot conclude that the application of the hearsay rule was error.

13. Smith complains that the trial court erred by excluding two photographs of himself taken when he was in the fifth grade. *Barnes v. State*, 269 Ga. 345, 357 (27) (496 SE2d 674) (1998). During the trial, the defense located Smith's fifth grade teacher, who was willing to testify in mitigation. Although she was not on Smith's witness list, the trial court allowed her to testify. Smith tried to introduce three photographs of himself taken when he was in the fifth grade through the testimony of this witness, and the State objected on cumulative and discovery grounds. The trial court excluded two of the photographs.

Since Smith's murder conviction is reversed, we need not determine whether the exclusion of Smith's two fifth grade photographs amounts to reversible error. However, Georgia law is permissive with regard to the scope of admissible mitigation evidence, and relevant

---

[4] Smith's stepmother did testify that Smith and his mother had "lived in cars, moved from one apartment to another, with a series of men."

mitigation evidence should not be excluded unless it is unreasonably cumulative. *Barnes*, supra at 358-360 (27). The admission of three fifth grade photographs, the only photographs that Smith sought to admit, would not be unreasonably cumulative. We do not address the discovery violation basis for excluding this mitigation evidence because, as the State is now aware of this evidence before retrial, this issue will not recur.

14. Smith claims that the State improperly introduced aggravating evidence that violated his First Amendment rights. Defendant's DFACS caseworker testified that she had attempted to place Smith in a religious-based group home, and Smith had told the home director that "I'm not a Christian, I'm a Buddhist, and I don't agree with all of the religious part of this." She also testified that Smith was ejected from the group home after he told other residents that he was a member of an Asian gang, and that Smith had told her that he would do whatever was necessary to be connected with an Asian gang.

As to the religious statement, the trial court sustained Smith's objection, ordered the testimony stricken, and instructed the jury that it was not to consider the religious reference in reaching its verdict. Smith did not object to the curative instructions or move for a mistrial after they were given. Therefore, this issue has not been preserved for appellate review. *Weems v. State*, 268 Ga. 515, 516 (2) (491 SE2d 325) (1997). As to the Asian gang reference, the record shows that Smith did not object to this testimony so this argument is waived on appeal. *Earnest v. State*, 262 Ga. 494, 495 (1) (422 SE2d 188) (1992).

15. The trial court did not err by refusing to allow the parties to make opening statements at the beginning of the sentencing phase. While we think it is the better practice to allow the parties to outline for the jury their expected evidence in aggravation or mitigation, there is no statute, rule or caselaw requiring an opening statement in the sentencing phase. In addition, since the parties made opening statements at the beginning of the guilt/innocence phase, the trial court instructed the jury on the purpose of the sentencing phase at the beginning of the sentencing phase, and the sentencing phase only lasted a few hours, Smith was not harmed by the trial court's decision.

16. The trial court did not err by denying Smith's motion to introduce evidence in the sentencing phase describing "the process and effects of death by electrocution." While Georgia allows a wide range of mitigation evidence, the evidence must relate to the character, background or offense of the particular defendant on trial and not to circumstances that may confront many or all capital defendants. *Barnes*, 269 Ga. at 359 (27). This Court has previously deter-

mined that evidence on the nature of death by electrocution is inadmissible in the sentencing phase. Id.; *Pope v. State*, 256 Ga. 195, 203 (9) (345 SE2d 831) (1986).

17. Smith's claim that execution by electrocution constitutes cruel and unusual punishment under the United States and Georgia constitutions has been decided adversely to him. *DeYoung v. State*, 268 Ga. 780, 786 (6) (493 SE2d 157) (1997); *McMichen v. State*, 265 Ga. 598, 611 (27) (458 SE2d 833) (1995).

18. There is no merit to Smith's contention that the Georgia death penalty statutes are unconstitutional due to the district attorney's discretion, or for any other reason stated by Smith. *McMichen*, supra at 611 (25), (26). The method by which this Court conducts its review of the proportionality of death sentences is constitutionally sound. Id. at 611 (25).

19. The Unified Appeal Procedure is not unconstitutional. *Wellons v. State*, 266 Ga. 77, 91 (33) (463 SE2d 868) (1995).

20. "The trial court did not err in failing to charge the jury on a burden of proof with regard to non-statutory aggravating circumstances." *McClain v. State*, 267 Ga. 378, 387 (8) (477 SE2d 814) (1996); *Ross v. State*, 254 Ga. 22, 31 (5) (d) (326 SE2d 194) (1985).

*Judgment affirmed in part and reversed in part. All the Justices concur, except Hunstein, J., who concurs in part and dissents in part, and Carley, J., who dissents.*

HUNSTEIN, Justice, concurring in part and dissenting in part.

I concur in the reversal of the death sentence and in all divisions of the majority opinion except Divisions 4, 6 and 7. However, I dissent to the reversal of the conviction for the reasons set forth in the dissenting opinion.

CARLEY, Justice, dissenting.

In Division 4, the majority holds that it was reversible error to exclude evidence which it deems to be relevant and exculpatory of Smith. In my opinion, Smith did not preserve this issue for review by this Court. Moreover, even if this issue may be raised on appeal, I do not believe that the trial court erred in proscribing the introduction of the evidence. Therefore, I respectfully dissent to the reversal of Smith's conviction.

This issue arose, as the majority points out, in the context of the State's motion in limine. At the hearing thereon, the trial court only held that Smith could not introduce evidence of two prior occurrences involving the victim "unless and until they otherwise become relevant," and further ruled as follows: "If the defense feels at some point that that evidence becomes relevant through impeachment or other legal means then they are hereby instructed to bring it to the atten-

tion of the court outside the presence of the jury. . . ." Thus, the trial court did not make a definitive final ruling on the inadmissibility of the evidence, but simply held that its admissibility would be conditional upon a subsequent showing by Smith of its relevancy. "The trial court has an absolute right to refuse to decide the admissibility of evidence, allegedly violative of some ordinary rule of evidence, prior to trial. [Cits.]" *State v. Johnston*, 249 Ga. 413, 415 (3) (291 SE2d 543) (1982). In this case, the trial court exercised its right to refuse to determine the ultimate admissibility of the two prior incidents, and, as it was authorized to do, made its preliminary decision subject to subsequent revision if Smith could show the relevance of those incidents at a later hearing. *Pye v. State*, 269 Ga. 779 (6) (505 SE2d 4) (1998); *Smith v. State*, 270 Ga. 240 (4) (510 SE2d 1) (1998); *Johnson v. State*, 270 Ga. 234 (2) (507 SE2d 737) (1998). It appears that Smith never asked for such a hearing. Moreover, neither the State nor Smith ever attempted to call the witnesses who could testify to the prior incidents, and Smith never raised the issue again during the guilt-innocence phase. It is my opinion that, under these circumstances, the exclusion of the evidence cannot constitute reversible error. *Pye v. State*, supra; *Johnson v. State*, supra.

However, even assuming that Smith was not required to raise the issue during the trial, I still cannot accept the majority's premise that evidence of the victim's possession of one of the shotguns two days before the homicide is relevant to the claim of self-defense. A defendant is entitled to attempt to prove his reasonable belief that force was a necessary response to the incident in question. Insofar as the admissibility of prior incidents involving the victim is concerned, however, the trial court is authorized to limit the evidence to those acts involving the use of a weapon or object to assail the defendant, and to those violent acts against third parties which were within the knowledge of the defendant. *Allen v. State*, 249 Ga. 486, 488 (4) (291 SE2d 719) (1982). See also *Williams v. State*, 254 Ga. 6, 11 (8) (326 SE2d 444) (1985); *Williams v. State*, 145 Ga. 177 (4) (88 SE 958) (1916); *A-1 Bonding Service v. Hunter*, 125 Ga. App. 173, 180 (6) (186 SE2d 566) (1971), aff'd 229 Ga. 104 (189 SE2d 392) (1972). Compare *Brady v. State*, 259 Ga. 573, 578 (2) (385 SE2d 653) (1989) (where the State opened the door on direct examination); *Daniel v. State*, 103 Ga. 202 (1) (29 SE 767) (1897) (the victim habitually and notoriously carried a concealed pistol); *Reynolds v. State*, 1 Ga. 222 (1846) (it was relevant to show that the victim armed himself 20-30 minutes before the murder). Consistent with these limitations on admissibility, this Court recently held in a unanimous decision that a victim's previous request to borrow the defendant's gun in order to shoot someone else does not tend to prove that the victim was attempting forcibly to take the defendant's gun on the night of the murder and, therefore, was

not relevant to justification. *Bennett v. State*, 265 Ga. 38, 41 (4) (453 SE2d 458) (1995). Similarly, the fact that the victim here previously carried Smith's gun without any violent or threatening incident, but in alleged preparation for the robbery of someone else, does not tend to prove that the victim carried the gun on the day of the murder or attempted to use it in any violent or threatening manner. "The prior act of possessing a gun is not admissible for the purpose of proving that because he possessed a gun on another occasion, he was likely to have one on the night in question. [Cit.]" *State v. White*, 909 SW2d 391, 395 (II) (B) (Mo. App. W.D. 1995).

The exclusion of evidence on grounds of irrelevancy is reversible error only if that ruling constitutes an abuse of the trial court's discretion. "[T]he admission or exclusion of evidence which is objected to on the ground of relevancy lies within the sound discretion of the trial court, whose decision will not be disturbed on appeal absent a clear abuse of discretion." *O'Neal v. State*, 254 Ga. 1, 3 (3) (325 SE2d 759) (1985). Furthermore, " '[t]he scope of cross-examination is not unlimited, but rests largely within the discretion of the trial court, and its discretion will not be disturbed on appeal unless it has been abused.' [Cit.]" *Williams v. State*, 254 Ga., supra at 11 (8). In my opinion, *Bennett v. State*, supra at 41 (4), is controlling authority which compels a holding that the trial court's exclusion of the evidence in this case was not an abuse of discretion. The excluded evidence does not implicate the victim in any relevant prior use of force, but merely constitutes an impermissible attack by Smith on the victim's character as an alleged co-conspirator in armed robbery. While justification is a defense to a criminal charge, evidence which only impugns the character of the deceased victim is not relevant to that defense. Therefore, I do not concur in the majority's holding in Division 4.

In Divisions 6 and 7, the majority finds that the trial court made additional erroneous evidentiary rulings, but relies upon the holding in Division 4 as obviating the need to address whether those rulings were harmful and thus reversible errors. Because of my disagreement with Division 4, I will address the merits of those evidentiary rulings to determine whether any is an independent ground for reversal of Smith's convictions.

In Division 6, the majority concludes that the trial court erred in holding that Smith could not impeach Hopkins with his prior inconsistent statement. It appears, however, that Smith was not seeking to prove that the witness had made any prior statements which were inconsistent with his testimony. At trial, Hopkins testified that he had made a certain previous statement to the police. Smith did not attempt to prove that, on any previous occasion, Hopkins denied that he made that statement to the police. Smith wanted only to show that Hopkins' present testimony about the existence of his previous

statement was not true. "As the absence of a prior statement . . . fails to amount to a contradiction, there could be no impeachment under the provisions of OCGA § 24-9-83. . . . [Cit.]" *Thomas v. State*, 168 Ga. App. 587 (1) (309 SE2d 881) (1983). See also *Hightower v. State*, 227 Ga. App. 74, 77 (a) (487 SE2d 646) (1997); *Weathers v. State*, 198 Ga. App. 871 (2) (403 SE2d 449) (1991). Smith never made any proffer of Hopkins' prior statements and, thus, never showed the absence of the particular statement at issue. *Thompson v. State*, 187 Ga. App. 152 (369 SE2d 523) (1988). It is clear that, in order to obtain a reversal, an appellant must demonstrate harm as well as error. *Davis v. State*, 266 Ga. 801, 804 (9) (471 SE2d 191) (1996). The actual making of a particular statement by Hopkins was not material to Smith's guilt or innocence. *Thomas v. State*, supra at 587 (1). See also *Hightower v. State*, supra at 77 (a). Therefore, I do not believe that, even if the trial court's evidentiary ruling was erroneous, it requires reversal of Smith's conviction.

In Division 7, the majority holds that a general inquiry into whether Hopkins was a racist was relevant because of a purported dispute over who made a particular racial comment regarding the victim. As noted, however, this Court should not disturb the trial court's discretion, absent a clear abuse, in limiting the scope of cross-examination on relevancy grounds.

> "[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." [Cit.]

*Farley v. State*, 225 Ga. App. 687, 692 (484 SE2d 711) (1997). Cross-examination regarding general racial bias or prejudice is often only marginally relevant, at best.

> To justify court sanctioned fishing in the murky and dangerous currents of racial bias or prejudice, there must be a foundation laid, sufficient to justify the risk of dredging up passions that may overcome the jury or the public, undermining the administration of justice and the perception of equal justice. Only a potential violation of due process by denial of the right of confrontation in the proper case, supported by the proper evidentiary basis, will justify . . . permitting such cross-examination. General racial bias or prejudice alone would not be sufficient.

*Farley v. State*, supra at 692. The trial court specifically permitted

defense counsel to ask Hopkins other relevant questions, such as whether he was the one who actually used the racial slur. "The inflammatory nature of racial bias is such that it requires careful shepherding in its presentation to the jury. [Cit.]" *Moreno v. United States*, 482 A2d 1233, 1238 (III) (D.C. App. 1984). Hopkins' racism, even if proved, is neither exculpatory of Smith's guilt for the murder nor does it make it any more likely that Hopkins, rather than Smith, made a particular racial remark about the victim. If Hopkins was subject to impeachment, then Smith should have attempted to impeach him. If Hopkins was not subject to impeachment, then Smith should not be allowed to attack his character by questioning him about the irrelevant topic of his purported racism. In my opinion, the question asked by Smith regarding racism on the part of Hopkins injected into the trial an improper element of racial bias, and the trial court was authorized to exclude such evidence as irrelevant. *Farley v. State*, supra at 694; *Shropshire v. State*, 210 Ga. App. 241, 242 (1) (435 SE2d 700) (1993); *Mitchell v. State*, 200 Ga. App. 146, 148 (2) (407 SE2d 115) (1991).

Also in Division 7, the majority concludes that the trial court erred by preventing Smith from testifying that he had dated an African-American woman. Again, however, there is nothing to suggest that the trial court abused its discretion in concluding that evidence of Smith's romantic relationships had no bearing on whether he made a racial slur about an individual whom he was charged with murdering. Such evidence might be admissible at the sentencing phase of the trial, but was, in my opinion, a completely irrelevant topic during the guilt-innocence phase. Moreover, the record shows that defense counsel never made a proffer as to what Smith would answer if the question was posed to him. Indeed, there is other testimony that the female in question was white. Because no proffer was made, there is nothing to review. *Harris v. State*, 263 Ga. 526, 527 (2) (435 SE2d 669) (1993).

I agree with the majority that there is no error in any of the remaining enumerations regarding Smith's guilt. Under the majority's holdings in Divisions 4, 6 and 7, however, it is now permissible for the defendant to make an irrelevant attack on the character of the victim and the State's witnesses, while introducing during the guilt-innocence phase irrelevant character evidence regarding his romantic inclinations. Because I cannot agree with those holdings, I dissent to the reversal of Smith's convictions for murder and for possession of a firearm during the commission of a felony. Furthermore, I believe that there is no error in the sentencing phase and, therefore, that both the judgments of conviction and the sentences should be affirmed.

DECIDED NOVEMBER 9, 1998.

*John A. Beall IV,* for appellant.

*Robert E. Keller, District Attorney, David B. Hornsby, Assistant District Attorney, Thurbert E. Baker, Attorney General, Susan V. Boleyn, Senior Assistant Attorney General, Christopher L. Phillips, Assistant Attorney General,* for appellee.